BRYAN, Judge.
 

 In these consolidated appeals, C.J. (“the father”) and A.J. (“the mother”) appeal a judgment terminating their parental rights with respect to their minor child S.K.J. We affirm.
 

 The mother and the father met in June 2005 and married on August 20, 2005, when the mother was 19 years old and the father was 18. The mother was approximately five months pregnant with another man’s child when they married; she subsequently gave birth to that child, a boy named C.A.J., on October 3, 2005.
 

 In December 2005, C.A.J. suffered a seizure and was taken to the hospital. The hospital informed the Marion County Department of Human Resources (“DHR”) that CA.J. had suffered serious brain injuries that were likely caused by his having been shaken violently. As a result, DHR picked up C.A.J., and both DHR and the Alabama Bureau of Investigation investigated to determine the cause of C.A.J.’s injuries. In January 2006, the father signed a written statement in which he admitted that he had shaken C.A.J. on two occasions, and the mother signed a written statement in which she stated that the father had admitted to her that he had shaken C.A.J. on two occasions. DHR then petitioned the juvenile court to terminate the mother’s and the father’s parental
 
 *1263
 
 rights with respect to C.A.J.
 
 [1]
 

 The juvenile court appointed an attorney to represent the mother and the father in the termination-of-parental-rights proceeding regarding C.A.J. While that proceeding was pending, DHR told the mother and the father that it would close its file on them if they consented to the termination of their parental rights with respect to C.A.J. The mother and the father subsequently consented to the termination of those rights, and the juvenile court, on May 5, 2006, entered a judgment terminating those rights. However, before DHR closed its file on the mother and the father, it learned that the mother was pregnant with another child and informed the mother and the father that, although it was closing its file on them, the possibility existed that they could lose custody of their unborn child because C.A.J. had suffered abuse while in their custody. DHR then closed its file on the mother and the father.
 

 In September 2006, the father was indicted for felony child abuse as a result of his allegedly shaking C.A.J. Shortly before October 13, 2006, DHR received an anonymous report that the mother had been admitted to the hospital in order to give birth to the child she had been carrying when DHR had closed its file on the mother and the father. On October 15, 2006, DHR received a report that, on October 18, 2006, the mother had given birth to a male child named S.K.J. DHR sought and obtained a pick-up order from the juvenile court on the ground that, because S.KJ.’s sibling had been abused while in the care of the mother and the father, the risk that S.K.J. would suffer abuse while in their care was too great for him to remain in their custody. Pursuant to that order, DHR picked up S.K.J. on October 15, 2006, and placed him in foster care.
 

 On October 17, 2006, DHR petitioned the juvenile court for temporary custody of S.K.J. That same day, the juvenile court held a shelter-care hearing regarding S.K.J.
 
 [2]
 
 The record on appeal does not contain a transcript of the shelter-care hearing. On October 25, 2006, the juvenile court entered an order regarding the shelter-care hearing. Although the record on appeal does not contain that order, other parts of the record indicate that that order maintained DHR’s temporary custody of S.K.J. In addition, a portion of the October 25, 2006, order was read into the record at trial in this matter. That portion of the order stated:
 

 “The Court finds that reasonable efforts to preserve or reunify the family are not required because the child cannot safely remain at home or be safely returned home based upon the following: The parents have subjected the child to aggravated eircumstance[s], for example, the father has committed abusive acts against the child’s sibling, and a risk of maltreatment is too high for the child to safely remain at or be returned home.”
 
 [3]
 

 
 *1264
 
 On October 31, 2006, S.KJ.’s paternal great-aunt, K.E.H., and her husband, C.D.H. (“the great-aunt and great-uncle”), petitioned the juvenile court for temporary custody of S.KJ. and filed documents signed by the mother and the father in which they consented to the juvenile court’s granting the great-aunt and great-uncle temporary custody of S.K. J.
 

 The juvenile court held a permanency hearing on November 14, 2006.
 
 [4]
 
 Following the permanency hearing, the juvenile court entered an order regarding the permanency plan for S.K.J. Although the record on appeal does not contain a transcript of the permanency hearing or the order regarding the permanency plan for S.K.J., other parts of the record on appeal indicate that DHR informed the juvenile court at the permanency hearing that DHR planned to seek the termination of the mother’s and the father’s parental rights so that S.K.J. could be adopted by his foster family.
 

 On December 14, 2006, the juvenile court entered an order requiring the father to participate in a domestic-violence-intervention program. On December 19, 2006, DHR petitioned the juvenile court (1) to appoint an attorney to represent the mother and the father, (2) to appoint a guardian ad litem to protect S.K.J.’s interest, and (3) to terminate the mother’s and the father’s parental rights with respect to S.K.J. The juvenile court appointed an attorney to represent both the mother and the father and appointed another attorney to serve as guardian ad litem for S.K.J. Subsequently, the father employed his own attorney.
 

 Having ordered that DHR’s action seeking the termination of the mother’s and the father’s parental rights and the great-aunt and great-uncle’s action seeking custody be consolidated for purposes of trial, the juvenile court received evidence ore tenus at a trial on March 30, April 24, May 3, June 22, and August 24, 2007. On May 3, 2007, the mother moved the juvenile court to dismiss DHR’s action seeking the termination of her parental rights on the
 
 *1265
 
 grounds, among others, (1) that the mother did not recall being advised by the juvenile court at the shelter-care hearing that she had the right to an appointed attorney if she were unable for financial reasons to retain her own, as required by § 12 — 15—60(c), Ala.Code 1975;
 
 [5]
 
 and (2) that the juvenile court had not appointed an attorney to represent the mother at the shelter-care hearing as required by § 12-15 — 63(b), Ala.Code 1975.
 
 [6]
 
 However, the mother did not support her motion to dismiss with an affidavit or any other evidence tending to prove that the juvenile court had failed to advise her of her right to an attorney at the shelter-care hearing or that she had requested an appointed attorney at any time before the juvenile court appointed one to represent her. On May 9, 2007, DHR filed a response to the mother’s motion to dismiss in which DHR stated, in pertinent part:
 

 “In accordance with § 12-15-60(c) and § 12 — 15—63(b), Code of Alabama [1975], at the commencement of the Shelter Care/Dependancy hearing held on October 17, 2006 the Court advised/informed [the mother] and [the father] of their right to be represented by counsel. Neither party requested the appointment of counsel based upon inability to retain counsel for financial reasons .... ”
 

 The record does not contain any indication that the juvenile court ruled on the motion to dismiss the mother filed on May 3, 2007. On June 22, 2007, the mother filed a renewed motion to dismiss on the grounds, among others, (1) that the juvenile court had failed to advise her at the shelter-care hearing of her right to an attorney; and (2) that the juvenile court had not appointed an attorney to represent her at the shelter-care hearing. In addition, she alleged that she had twice requested the tape recordings of the shelter-care hearing and the permanency hearing, but the tape recordings were not in the court file and had not been located. However, the mother did not support her renewed motion to dismiss with an affidavit tending to prove that the juvenile court had failed to advise her at the shelter-care hearing of her right to an attorney or that she had requested an appointed attorney at any time before the juvenile court appointed one to represent her. When the juvenile court heard the mother’s renewed motion to dismiss, the mother’s attorney stated, in pertinent part:
 

 “As counsel [for DHR] pointed out earlier, this is a renewed motion. And basically counsel [for DHR] has responded to my Initial Motion to Dismiss based on the parent was not appointed counsel timely, by his statement that my client, [the mother], was advised that she had the right to counsel in the initial shelter care and the subsequent permanency hearing.
 

 “I attempted to verify that but was unable to because I can’t find the tapes in the court file. So I think that at this point the burden of proof is on [DHR] to produce those tapes.
 

 [[Image here]]
 

 “In talking with my client, it’s her— she stated to me that she
 
 doesn’t recall
 
 being advised that she had the right to
 
 *1266
 
 counsel. There’s no record that I can find of such an advisement in the shelter-care hearing or permanency hearing.”
 

 (Emphasis added.)
 

 In response, DHR’s attorney stated, in pertinent part:
 

 “It is my recollection that [the mother] as well as [the father] were advised by this honorable Court of [their] right to retain counsel. Neither party made request of appointed counsel, stating as their basis financial inability.
 

 “The code does not mandate court appointment of counsel, but the code says that the Court shall appoint counsel as required.”
 

 After hearing the arguments of the attorneys regarding the mother’s renewed motion to dismiss, the juvenile court denied that motion.
 

 At the trial, Dr. Kathy Ronan, a clinical psychologist who had evaluated the mother and the father at the behest of DHR, testified that she had diagnosed the father as suffering from post-traumatic stress disorder; major depression, recurring; anxiety disorder, not otherwise specified; and personality disorder, not otherwise specified. She also gave the father a provisional diagnosis of dissociative disorder, not otherwise specified. She further testified that, because of those disorders, the father is “struggling just to maintain a basic daily lifestyle” and his capacity to parent a child is highly impaired. In addition, she testified that the father had related to her that, when he had shaken C.A.J., he had been unable to stop himself from doing so. Consequently, Dr. Ronan opined, if S.K.J. were in the care of the father, the father could become angry, lose control of himself, and shake S.K.J. to death. Although Dr. Ronan opined that the father’s psychological problems could be treated, she testified that it would take years of intensive therapy for him to make significant progress.
 

 Dr. Ronan testified that the mother suffered from a personality disorder that had resulted in a series of failed relationships. The symptoms of this personality disorder consisted of the mother’s excessive emotional dependence on another person followed by emotional withdrawal from that person. Dr. Ronan also testified that the mother felt no anger or negative emotions toward the father as a result of his injuring C.A.J. and that such a lack of emotion was abnormal. In addition, Dr. Ronan testified that the results of the written tests she had administered to the mother indicated that she tended to “become very self-focused to the exclusion of the needs of others .... ” She also testified that, although the mother did not exhibit all the signs of post-traumatic stress disorder, the ones she did exhibit interfered with her general functioning. Although Dr. Ronan opined that the mother’s psychological problems could be treated, she opined that it would take years of intensive therapy for her to make significant progress.
 

 Dr. Trudi Porter, a clinical psychologist who evaluated the mother and the father at their behest, testified that the father experienced rages over which he did not seem to have much control and, therefore, should not have sole responsibility for a child at the present time because he could harm the child while it was in his care. Dr. Porter opined that the father could improve to a great extent if given intensive treatment for one to two years.
 

 Dr. Porter testified that the mother had “personality issues” and “bonding issues” with respect to C.A.J. and S.K.J. as evidenced by her lack of any emotional response to her losing custody of them. Dr. Porter further testified that the mother would need therapy to address those is
 
 *1267
 
 sues in order to be a good parent. In addition, Dr. Porter testified that, although she did not think that the mother posed a direct threat to S.K.J., the mother’s lack of emotional response to the father’s injuring C.A.J. caused Dr. Porter to question whether the mother’s instinct to protect S.K.J. was strong enough to prompt her to intervene if the father attempted to hurt S.K.J. Moreover, Dr. Porter testified that, even if the mother divorced the father, she would not recommend that the mother be given custody of S.K.J. until the mother had received therapy and had acquired parenting skills.
 

 In their testimony, both the mother and the father admitted that they were not capable of taking care of S.K.J. at the present time. They also admitted that they were both unemployed and that their mobile home had been bought for them by S.KJ.’s paternal grandfather (“the paternal grandfather”), who is a convicted sex offender.
 

 Crystal Roberts, an employee of the De-Kalb County Department of Human Resources (“the DeKalb DHR”), testified that DHR had requested that the DeKalb DHR do a home study of the great-aunt and great-uncle, who are residents of DeKalb County. Roberts further testified that she was the DeKalb DHR employee who had done that home study and that she had recommended that the great-aunt and great-uncle not be awarded custody of S.K.J. for three reasons. The first reason was that the paternal grandfather, who is a convicted sex offender, is very involved in the life of the great-aunt. He and the great-aunt have a close relationship; the great-aunt has allowed the paternal grandfather to be around her children in her home and at family gatherings; and the great-aunt had stated that the paternal grandfather would be a source of financial assistance if she and the great-uncle were awarded custody of S.K.J. The second reason was that the great-uncle, who has had two heart attacks, would be the primary caregiver for S.K.J. while the great-aunt is working. The third reason was that the great-aunt had demonstrated a propensity to disregard court orders by disregarding a protection-from-abuse order she had obtained against one of her brothers.
 

 The great-aunt and great-uncle introduced the testimony of several witnesses that tended to prove that the great-aunt and great-uncle have been loving parents to their own children.
 

 Ali Tyra, the DHR employee assigned to this matter, testified that, even though DHR was aware that the mother was pregnant with S.K.J. when DHR closed its file regarding the mother and the father, it could not provide the mother and the fa.ther with services during the period between the termination of the mother’s and the father’s parental rights with respect to C.A.J. and the birth of S.K.J. because DHR is not authorized to provide services to the parents of an unborn child. Tyra further testified that it sought a pick-up .order with respect to S.K.J. on October 15, 2006, because the father’s abuse of C.A.J. and the mother’s failure to protect C.A.J. from that abuse indicated that S.K.J. could not safely remain in the custody of the mother and the father. Tyra also testified that the abuse suffered by C.A.J. while in the custody of the mother and the father constituted an “aggravating circumstance” that, pursuant to § 12-15-65(m), relieved DHR of the obligation to make reasonable efforts to reunify the family before seeking termination of the mother’s and the father’s parental rights.
 

 In addition, Tyra testified that DHR had determined that no viable alternative to termination of the mother’s and father’s parental rights existed. When dealing with C.A.J., DHR had requested that the
 
 *1268
 
 mother and the father provide them with the names of relatives with whom C.A.J. could possibly be placed while the mother and the father rehabilitated themselves. The mother identified C.A.J.’s maternal grandmother and grandfather and K.P., a cousin, as relatives with whom C.A.J. might possibly be placed. Tyra spoke to the maternal grandmother and grandfather; the maternal grandmother told Tyra that they were financially unable to support C.A.J. and that he needed to be placed for adoption rather than placed temporarily with a relative. The mother never provided Tyra with contact information for K.P. After picking up S.K.J. on October 15, 2006, DHR identified Mr. and Mrs. T. as relatives with whom S.K.J. might possibly be placed temporarily; however, DHR learned at the shelter-care hearing that the mother and the father were living with Mr. and Mrs. T., and, therefore, their home would not be safe for S.K.J. Tyra testified that she requested at the shelter-care hearing that the mother and the father provide her with the names of relatives who would be suitable custodians for S.K.J., but they never provided her with any other names.
 

 Tyra testified that in mid-October 2006 the great-aunt, the paternal grandfather, and the paternal grandmother came to the DHR office and that Tyra encouraged the great-aunt to file a petition for custody of S.K.J. However, the subsequent home study regarding the great-aunt and great-uncle indicated that they would not be suitable for placement of S.K.J.
 

 The mother testified that she had told DHR that her brother and her aunt and uncle were relatives who would be suitable temporary custodians of S.K.J. In addition, both the mother and the great-aunt testified that there were other relatives who would be suitable temporary custodians of S.K.J. whom DHR had not contacted.
 

 Following the trial, the juvenile court entered a judgment finding that S.K. J. was dependent, finding that the great-aunt and great-uncle were not suitable custodians for S.K.J., finding that no other relatives of the mother and the father were suitable custodians for S.K.J., finding that S.K.J. could not be returned to the home of the mother and the father now or in the foreseeable future because the danger to him was too great, finding that the mother and the father were presently unable to take care of S.K.J. and that they were not likely to be able to do so in the foreseeable future, finding that no viable alternatives to the termination of the mother’s and the father’s parental rights existed, and terminating the mother’s and the father’s parental rights. The mother and the father timely appealed to this court.
 
 [7]
 
 The juvenile court subsequently certified that the record on appeal was adequate for appellate review in accordance with Rule 28(A)(1)(a), Ala. R. Juv. P.
 
 [8]
 

 Before we review the merits of the juvenile court’s judgment, we must consider two procedural arguments the mother has presented.
 
 [9]
 
 The mother’s first procedural argument is that the record on appeal is inadequate for appellate review because it does not contain transcripts of the
 
 *1269
 
 shelter-care hearing and the permanency hearing. She further argues that, because the record on appeal is allegedly inadequate for review by an appellate court due to the absence of transcripts of those hearings, we should transfer the mother’s appeal to the Marion Circuit Court for a trial de novo. “Rule 28(B), Ala. R. Juv. P., provides that an appeal from a juvenile court shall be to the circuit court for a trial de novo when the record on appeal is inadequate for review by an appellate court. Rule 28(D), Ala. R. Juv. P., provides that ‘[a]n appellate court or circuit court may transfer an appeal that it determines should have been transferred to or brought in another court to that other court.’ ”
 
 W.E.C. v. Madison County Dep’t of Human Res.,
 
 909 So.2d 849, 850 (Ala. Civ.App.2005). If, in an appeal from a juvenile court, we determine that the record is inadequate for review by an appellate court, we can transfer the appeal to the circuit court for a trial de novo despite the juvenile court’s having certified that the record is adequate for review by an appellate court.
 
 Id.
 

 In
 
 W.E.C.,
 
 we held that, when the record on appeal in a dependency action did not contain a transcript of the dispositional hearing, the record on appeal was inadequate for review by an appellate court, and we transferred the appeal to the circuit court for a trial de novo. In
 
 R.G. v. C.M.,
 
 980 So.2d 417 (Ala.Civ.App.2007), we held that, when the record on appeal in a dependency action did not contain transcripts of any of the hearings before the juvenile court, the record on appeal was inadequate for review by an appellate court, and we transferred the appeal to the circuit court for a trial de novo.
 

 However, in the case now before us, although the record on appeal does not contain transcripts of the shelter-care hearing and the permanency hearing, it does contain a 1,071-page transcript of the trial on the merits of DHR’s termination action and the great-aunt and great-uncle’s action seeking custody. Thus, we have before us the evidence upon which the juvenile court based its judgment terminating the mother’s and the father’s parental rights and denying the great-aunt and great-uncle’s claim for custody. A trial de novo in the circuit court would merely duplicate the evidence we already have before us. Therefore, in the case now before us, we conclude that the record on appeal is adequate for our review despite the absence of transcripts of the shelter-care hearing and the permanency hearing, and we reject the mother’s first procedural argument.
 

 The mother’s second procedural argument is that we should reverse the juvenile court’s judgment terminating her parental rights because, she says, she does not recall being advised at the shelter-care hearing of her right to an attorney and the juvenile court did not appoint an attorney to represent her until after the permanency hearing.
 
 [10]
 
 However, in the juvenile court, the mother never submitted an affidavit attesting that she did not recall being informed at the shelter-care hearing of her right to an attorney or that she had requested that the juvenile court appoint an attorney to represent her before the juvenile court appointed one. Although the mother’s attorney, during his argument in support of the mother’s renewed motion to dismiss DHR’s action, informed the juvenile court that the mother had told him that she did not recall being advised at the
 
 *1270
 
 shelter-care hearing of her right to an attorney, “[t]he unsworn statements, factual assertions, and arguments of counsel are not evidence.”
 
 Ex parte Russell,
 
 911 So.2d 719, 725 (Ala.Civ.App.2005). In the absence of any
 
 evidence
 
 indicating that the mother did not recall being advised at the shelter-care hearing of her right to an attorney, we cannot reverse the juvenile court’s judgment on the ground that she does not recall being so advised.
 
 See E.S.R. v. Madison County Dep’t of Human Res.,
 
 [Ms. 2060800, March 28, 2008] — So.3d -, - (Ala.Civ.App.2008) (holding that, in the absence of a transcript of the shelter-care hearing or any evidence indicating that the father did not receive proper notice of the shelter-care hearing, we could not reverse the judgment of the juvenile court on the ground that the father did not receive proper notice of the shelter-care hearing). Moreover, even if we treated the representation of the mother’s attorney as evidence establishing that she did not recall being advised at the shelter-care hearing of her right to an attorney, such evidence would not tend to prove that she was indeed not advised of that right — it would merely tend to prove that she does not recall whether she was advised of that right. Therefore, we find no merit in the mother’s argument that we should reverse the juvenile court’s judgment terminating her parental rights because, she says, she does not recall being advised at the shelter-care hearing of her right to an attorney.
 

 Likewise, we find no merit in the mother’s argument that we should reverse the juvenile court’s judgment terminating her parental rights because the juvenile court did not appoint an attorney to represent the mother until after the permanency hearing. In a dependency action, the juvenile court is obligated to inform the parents of their right to an attorney; however, the juvenile court is not obligated to appoint an attorney unless the parents, having been informed of their rights, request the appointment of one.
 
 See
 
 § 12-15 — 63(b) (“In dependency cases, the parents ... shall be informed of their right to be represented by counsel and,
 
 upon request,
 
 counsel shall be appointed where the parties are unable for financial reasons to retain their own.” (emphasis added)); and § 12-15-60(c) (“At the commencement of the ... shelter or other care hearing, the court shall advise the parties of the right to counsel and shall appoint counsel
 
 as required.”
 
 (emphasis added)). The record on appeal does not contain any evidence indicating that the mother requested that an attorney be appointed to represent her at any time before the juvenile court appointed one to represent her. Consequently, we cannot reverse the juvenile court’s judgment on the ground that the juvenile court did not appoint an attorney to represent the mother until after the permanency hearing.
 
 See
 
 §§ 12-15-6S(b) and 12 — 15—60(c).
 

 Having found no merit in the mother’s procedural arguments, we will next consider the arguments of the mother and the father challenging the merits of the juvenile court’s judgment. In doing so, we are governed by the following principles:
 

 “A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong.
 
 See, e.g., F.I. v. State Dep’t of Human Res.,
 
 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its
 
 *1271
 
 decision on conflicting ore tenus evidence.
 
 Ex parte State Dep’t of Human Res.,
 
 834 So.2d 117, 122 (Ala.2002) .... Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence.
 
 F.I.,
 
 975 So.2d at 972.
 

 [[Image here]]
 

 “This court has stated that clear and convincing evidence is
 

 “ ‘ “[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
 

 “ ‘§ 6 — 11—20[ (b) ](4), Ala.Code 1975.’
 
 “L.M. v. D.D.F.,
 
 840 So.2d 171, 179 (Ala. Civ.App.2002) ....
 

 [[Image here]]
 

 “... [I]n cases involving the termination of parental rights our appellate courts do not apply the clear-and-convincing-evidence standard of proof utilized by trial courts but, instead, use a settled standard of appellate review— the ore tenus rule.
 
 See Ex parte State Dep’t of Human Res.,
 
 834 So.2d at 122. Because appellate courts do not weigh evidence, particularly when ‘the assessment of the credibility of witnesses is involved,’
 
 Knight
 
 [
 
 v. Beverly Health Care Bay Manor Health Care Ctr.],
 
 820 So.2d [92,] 102 [ (Ala.2001) ], we defer to the trial court’s factual findings. ‘The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court’s findings because of that court’s unique ability to observe the demeanor of witnesses.’
 
 Id.;' see also Fitzgerald v. Jeter,
 
 428 So.2d 84, 85 (Ala.Civ.App.1983), and
 
 Ex parte Fann,
 
 810 So.2d 631, 633 (Ala.2001).”
 

 J.C. v. State Dep’t of Human Res.,
 
 986 So.2d 1172, 1183-85 (Ala.Civ.App.2007) (footnotes and emphasis omitted).
 

 “In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief.
 
 Ostrander v. Ostrander,
 
 517 So.2d 3 (Ala. Civ.App.1987). Further, in determining the weight to be accorded to the testimony of any witness, the trial court may consider the demeanor of the witness and the witness’s apparent candor or evasiveness.
 
 Ostrander, supra
 
 .... It is not the province of this court to override the trial court’s observations.
 
 Brown
 
 [
 
 v. Brown,
 
 586 So.2d 919 (Ala. Civ.App.1991) ].”
 

 Woods v. Woods,
 
 653 So.2d 312, 314 (Ala. Civ.App.1994).
 

 When, as in the case now before us, the party seeking the termination of parental rights is a nonparent, the Alabama courts use a two-pronged test to determine whether to terminate the parental rights:
 

 “A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.
 
 Ex parte Beasley,
 
 564 So.2d 950, 954 (Ala.1990).”
 

 B.M. v. State,
 
 895 So.2d 319, 331 (Ala.Civ. App.2004).
 

 
 *1272
 
 In the ease now before us, neither the mother nor the father challenges the juvenile court’s determination that S.K.J. is dependent; indeed, they both concede in them briefs on appeal that S.K.J. is dependent. However, they argue that the juvenile court erred in finding that no other viable alternatives to the termination of their parental rights existed. Specifically, the mother and the father argue that two viable alternatives to termination of their parental rights exist: (1) maintaining S.K.J. in foster care while the mother and the father undergo therapy for their psychological problems; and (2) placing S.K.J. in the care of a relative while the mother and the father undergo therapy for their psychological problems.
 

 The juvenile court, however, found that the mother’s and the father’s inability to care for S.K.J. was unlikely to change in the foreseeable future. This finding is supported by the testimony of Dr. Ronan, who opined that it would take years of intensive therapy to treat the mother’s and the father’s psychological problems. Although Dr. Porter opined that the mother’s and the father’s psychological problems could be treated more quickly than Dr. Ronan believed they could be treated, the juvenile court was the sole judge of the facts and the credibility of the witnesses.
 
 See Woods v. Woods,
 
 supra. Because the juvenile court’s finding that the mother’s and the father’s inability to care for S.K.J. was unlikely to change in the foreseeable future is supported by the evidence, we cannot hold that the juvenile court erred in finding that maintaining S.K.J. in foster care indefinitely was not a viable alternative to termination of the mother’s and the father’s parental rights.
 
 See R.L.B. v. Morgan County Dep’t of Human Res.,
 
 805 So.2d 721, 725 (Ala.Civ.App.2001) (holding that maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights).
 

 Moreover, the juvenile court found that neither the great-aunt and great-uncle nor any other relatives were viable custodians for S.K.J. Although the great-aunt and great-uncle introduced testimony tending to prove that they had been loving parents to their own children, the juvenile court’s finding that the great-aunt and great-uncle were not viable custodians is supported by the testimony of Crystal Roberts, who testified that the paternal grandfather, who is a convicted sex offender, is very involved in the life of the great-aunt; that the great-uncle, who has had two heart attacks, would be S.KJ.’s primary caretaker while the great-aunt works; and that the great-aunt has demonstrated a propensity to disregard court orders. Accordingly, despite the evidence tending to prove that the great-aunt and great-uncle had been good parents to their own children, we cannot hold that the juvenile court’s finding that the great-aunt and great-uncle were not viable custodians for S.K.J. was so unsupported by the evidence as to be plainly and palpably wrong.
 

 Furthermore, Ali Tyra testified that, when dealing with C.A.J., she had investigated all the relatives suggested to her by the mother as suitable custodians for C.A.J. except K.P., whose contact information the mother had never provided, and that none of them were suitable. Tyra further testified that she had asked the mother and the father for additional names at the shelter-care hearing regarding S.K.J., but the mother and father never provided her with any additional names. Although the mother testified that she had given Tyra additional names following the shelter-care hearing and that Tyra had not investigated whether those relatives would be suitable custodians, the juvenile court was the sole judge of the facts and the
 
 *1273
 
 credibility of the witnesses — the juvenile court could have found that Tyra’s testimony was credible while the mother’s conflicting testimony was not.
 
 See Woods v. Woods,
 
 supra. Parents who oppose the termination of their parental rights have a duty to notify DHR of relatives or other persons who may be suitable temporary custodians.
 
 See M.E. v. Shelby County Dep’t of Human Res.,
 
 972 So.2d 89, 103 (Ala.Civ.App.2007) (plurality opinion). Accordingly, we cannot hold that the juvenile court’s finding that not only were the great-aunt and great-uncle not suitable custodians but also that no other relatives were suitable custodians was so unsupported by the evidence as to be plainly and palpably wrong. Thus, the juvenile court’s finding that no viable alternatives to termination of the mother’s and the father’s parental rights existed is due to be affirmed.
 

 Nonetheless, the mother and the father argue that we should reverse the juvenile court’s judgment because DHR did not provide them with therapy during the five months that elapsed between the termination of their parental rights with respect to C.A.J. and the birth of S.K.J. However, the mother and the father have not cited any law indicating that DHR was authorized to provide them with therapy during that five-month period. Moreover, the juvenile court could have found from the evidence indicating that it would take years of intensive therapy for the mother and the father to make significant progress in dealing with their psychological problems that DHR’s providing the mother and the father with therapy during that five-month period would not have altered the fact that the mother’s and the father’s inability to care for S.KJ. was unlikely to change in the foreseeable future.
 

 Finally, the mother and the father argue that, because DHR told them that it would close its file on them if they consented to the termination of their parental rights with respect to C.A.J., DHR should be precluded from seeking the termination of their parental rights with respect to S.K.J. In effect, the mother and the father are arguing that DHR’s telling the mother and the father that it would close its file on them if they consented to the termination of their parental rights with respect to C.A.J. was a promise that estopped DHR from seeking the termination of the mother’s and the father’s parental rights with respect to S.K.J. However, the mother and the father have not cited any law standing for the proposition that DHR’s performance of its statutory duties with respect to dependent children is subject to the doctrine of promissory estoppel. Moreover, DHR’s stating that it would close its file on the mother and the father if they consented to the termination of their parental rights with respect to C.A.J. was not tantamount to a promise that it would not seek the termination of the mother’s and the father’s parental rights with respect to children born after the termination of their parental rights with respect to C.A.J. Therefore, we find no merit in the mother’s and the father’s promissory-estoppel argument.
 

 For the reasons discussed above, we affirm the juvenile court’s judgment terminating the mother’s and the father’s parental rights.
 

 2061130 — AFFIRMED.
 

 2070017 — AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur in the result, without writing.
 

 [1]
 

 . Even though the father was not the biological father of C.A.J., he was the presumptive father because C.A.J. was born while the mother and the father were married.
 
 See
 
 § 26 — 17—5(a)(1), Ala.Code 1975("(a) A man is presumed to be the natural father of a child if any of the following apply: (1) He and the child’s natural mother are or have been married to each other and the child is born during the marriage .... ”).
 

 [2]
 

 . Section 12-15-60(a), Ala.Code 1975, provides, in pertinent part:
 

 “(a) When a child is not released from ... shelter care as provided in Section 12-15-58, a petition shall be filed and a hearing held within 72 hours, Saturdays, Sundays, and holidays included, to determine whether continued ... shelter care is required.”
 

 [3]
 

 . Generally, when DHR removes a child from its family, DHR is obligated to make reason
 
 *1264
 
 able efforts to reunify the child and the family,
 
 see
 
 § 12-15-65; however, § 12-15-65(m)(l) relieves DHR of that obligation when a court of competent jurisdiction determines that a parent has '‘[sjubjected the child to an aggravated circumstance ....”
 

 [4]
 

 . Section 12-15-62(c), Ala.Code 1975, provides, in pertinent part:
 

 "(c) Within 12 months of any court order placing a child in foster care the court shall hold a permanency hearing. The Department of Human Resources shall present to the court at such hearing a permanent plan for said child. If a permanent plan is not presented to the court at this hearing there shall be a rebuttable presumption that the child should be returned to the family. This provision is intended to insure that a permanent plan is prepared by the Department of Human Resources and presented to the court within 12 months of the placement of any child in foster care. The purpose of the permanency hearing shall be to determine the permanency plan for the child which may include whether and, if applicable, when, the child shall be (i) returned to the parent, (ii) placed for adoption wherein the Department of Human Resources shall file a petition for termination of parental rights, or (iii) referred for legal custody....”
 

 Ideally, the juvenile court should also determine at the permanency hearing whether viable alternatives to the termination of the parents' parental rights exist.
 
 See A.D.B.H. v. Houston County Dep’t of Human Res.,
 
 1 So.3d 53 (Ala.Civ.App.2008) (Bryan, J., concurring specially, joined by Thomas, J.; and Moore, J., concurring in part and concurring in the result). In the case now before us, the juvenile court made the determination that no viable alternatives to termination existed on the basis of the evidence introduced at the subsequent evidentiary hearing regarding DHR’s petition to terminate the mother’s and the father's parental rights and tire great-aunt and great-uncle's petition for temporaiy custody.
 

 [5]
 

 . In pertinent part, § 12-15-60(c) provides that "[a]t the commencement of the ... shelter or other care hearing, the court shall advise the parties of the right to counsel and shall appoint counsel as required.”
 

 [6]
 

 .
 
 In pertinent part, § 12-15-63(b), Ala.Code 1975, provides that ''[i]n dependency cases, the parents ... shall be informed of their right to be represented by counsel and, upon request, counsel shall be appointed where the parties are unable for financial reasons to retain their own.”
 

 [7]
 

 . The great-aunt and great-uncle appealed to this court from (lie denial of their petition for temporary custody. Their appeal was not consolidated with the mother’s and the father’s appeals.
 

 [8]
 

 . Rule 28(A)(1)(a) provides that, if the juvenile court certifies that the record is adequate for appellate review, an appeal may be taken from the juvenile court directly to the appropriate appellate court rather than to the circuit court for a trial de novo.
 

 [9]
 

 .The father does not make either of these procedural arguments.
 

 [10]
 

 . The father does not claim that he was not advised at the shelter-care hearing of his right to counsel or that the juvenile court erred in failing to appoint an attorney to represent him until after the permanency hearing.