PER CURIAM.
A.C. (“the mother”) and M.J.C. (“the father”) are the married parents of four children. Their youngest child, M.C. (“the child”), has lived with G.R.W. and K.W. (“the custodians”) since shortly after his birth in January 2006. In November 2008, on petition of the custodians, the Etowah Juvenile Court granted the custodians custody of the child. On December 4, 2009, the custodians filed a petition to terminate the parental rights of the parents. After a trial in May 2010, the juvenile court entered a judgment terminating the parental rights of both parents. After their jointly filed postjudgment motion was denied, both parents timely appealed, and their appeals were consolidated.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “ ‘[CJlear and convincing evidence’ ” is “‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. K.P. v. Etowah County Dep’t of Human Res., 43 So.3d 602, 605 (Ala.Civ.App.2010). Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker County Dep’t of Human Res., 919 So.2d 1197, 1210 (Ala.Civ.App.2005).
The termination of parental rights is governed by Ala.Code 1975, § 12-15-319. That statute reads, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
“(4) Conviction of and imprisonment for a felony.
*201 [[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
As noted above, the child has been living with the custodians since shortly after his birth. The record does not reflect exactly why the child was placed in the home of the custodians, but it is clear from the record that the parties agreed to the arrangement at that time. The custodians testified that, at the time they took the child into their home, they believed that they would adopt the child. However, the father testified that, at the time the child was placed with the custodians, the custodians swore that they would not try to take the child away from the father.
The custodians sought legal custody of the child in the fall of 2008. The record does not contain the petition by which the custodians sought custody or a transcript of the trial on the custody petition. However, the juvenile court awarded custody of the child to the custodians in November 2008. The mother was awarded visitation with the child; the testimony at trial indicated that the visits were to be supervised and held in the home of her mother and stepfather, G.N. (“the maternal grandmother”) and S.N. (“the maternal grandfather”) (referred to collectively as “the maternal grandparents”). The father, who was incarcerated at the time, was not awarded specified visitation with the child.
At the time of the May 2010 trial on the termination-of-parental-rights petition, the mother had pleaded guilty to robbery in the second degree; she was awaiting sentencing. The mother was not employed at the time of trial, although she testified that she had put in several applications for employment; she said that her pending criminal charge had prevented her from being offered employment. The mother had been employed at Pilgrim’s Pride, a chicken-processing plant, for two or three months in the fall of 2009 and for a week or two weeks at another place of employment. However, she said that she did clean houses periodically for some relatives.
The mother testified that she and her other three children live with the maternal grandparents. She said that she had lived with the maternal grandparents from the time that the father was first imprisoned in 2008 because she and the other three children could not afford the house payment without the father’s income. However, she said that she did assist the maternal grandparents by contributing money toward household expenses and by paying for groceries. The maternal grandmother also testified that the mother paid part of her earnings to the maternal grandmother for household expenses in lieu of rent.
The mother denied the accusation that the maternal grandmother parented the other three children. She said that she, and not the maternal grandparents, was the primary caregiver for the other children. However, the record reflects that the eldest child of the parties, who is the biological child of the mother and the father’s brother, had resided primarily with the maternal grandmother for most of that child’s life.
*202 The mother denied having left the maternal grandparents’ home to live with other people, including her one-time boyfriend and codefendant in the robbery case, K.B. She said that she had sometimes “stayed with” another person for a short time but that she had never lived with anyone other than the maternal grandparents. Both the mother and the maternal grandmother testified that the maternal grandfather had kicked the mother out of the house in the fall of 2008, after the robbery, when the mother began seeing K.B. again; the maternal grandmother testified that the mother was gone for only about three days, and the mother said that she worked it out with the maternal grandfather so she could move back into the home. At the time of trial, the mother was spending the weekends she did not have visits with the child at the home established by the father, where they intended to live as a family once the school year concluded.
The mother testified that she had offered the custodians clothing and had offered to help with anything the child needed but that the custodians had always refused when she made such offers. She said that she did purchase the child presents, including toys and clothing, most of which remained at the maternal grandparents’ home for the child’s use when he visited there. However, the evidence also reflected that the mother’s children had been the recipients of Christmas gifts donated by a local church. The mother said that the custodians had never told her that some of the child’s medical expenses were not covered by Medicaid.
The father testified that, at the time the custody judgment was entered in November 2008, he was incarcerated on a third-degree burglary charge. Although the father was released from jail in early December 2008, he violated his probation when he attempted to pass off someone else’s urine sample as his own. The father began serving the remainder of his sentence on May 6, 2009; he was released in January 2010 after he completed his sentence.
At the time of trial, the father testified, he was on “color code” drug testing based on a “Gadsden city charge” for marijuana possession from 2002. The father testified that he had passed all of his drug tests except for one, on which he had tested positive for a physician-prescribed painkiller. The father said that he provided a prescription for the painkiller after he tested positive for the controlled substance; because the father had a legal prescription, that positive test was excused. However, when questioned further at trial, the father admitted that he had not informed any one at the color-code program that he had been drinking alcohol or that the painkiller had been prescribed as a result of injuries resulting from an automobile accident he had been involved in while he was drunk in March 2010, only two months before the termination trial. The father further admitted that he had five felony convictions on his record: two forgery convictions, a theft-by-fraudulent-leasing conviction, an unlawful-possession-of-a-controlled-substance conviction, and the third-degree burglary conviction.
The father also admitted that he had not paid the custodians any child support or provided any other financial support for the child during his periods of incarceration. However, the father testified that he had helped the custodians in any way they asked him when he was not incarcerated, including providing clothing for the child and helping G.R.W. cut timber or work on his trucks. The father said that he had offered the custodians money more recently, in March 2010, but that they had refused it. At the time of trial, the father testified, he was working *203 for his brother at the brother’s towing and recovery business, earning $500 per week, or approximately $2,000 per month. The father testified that his monthly expenses were approximately $1,000 and that he typically had “about $1,000 extra” at the end of the month.
The father said that he lives in a house he rents from his brother. The house, said the father, has four bedrooms; he said that his two sons would share one room and that his daughters would each have their own room, leaving one room for him and the mother. He testified that he and the mother had decided to wait until the school year was over before she and the other three children moved in with him because the children were in the middle of the school year and the move would require them to change schools. According to the father, he and the mother intended to resume living together over the summer and to enroll the children in a school nearby for the fall semester. The father also testified that he had access to an automobile and that the mother would drive him where he needed to go; at the time of trial, the father had not yet had his drivers’ license reinstated because, he said, he could not afford the reinstatement fee despite his testimony that he had approximately $1,000 left after paying his bills each month and testimony that he had purchased two used automobiles since his release from prison in January.
According to the maternal grandmother, the mother was a proper parent to her other three children. The maternal grandmother said that the mother took care of her own children. She also testified that the father was “a good daddy” and that she had no reservations about him as a parent, despite his felony convictions and history of imprisonment. When asked whether she would be willing take custody of the child if the juvenile court determined that the parents were unfit, the maternal grandmother responded in the affirmative.
The maternal grandmother admitted that the November 2008 custody judgment stated that the mother had an obligation to financially provide for the child; however, the maternal grandmother noted that the judgment did not set an amount of child support. According to the maternal grandmother, the custodians had stated that “they are not asking [the mother] for nothing.” The maternal grandmother testified that she had heard the mother offer the custodians financial support and that the custodians had refused. She said that she had never heard the father make any offers of financial support to the custodians but that she had heard him and the mother discuss making offers to the custodians to provide clothing and other items for the child.
K.W. testified that the child had lived with the custodians since he was five days old. She said that she and G.R.W. had always believed that they would adopt the child. She explained that she was self-employed and that she sat with the ill and elderly overnight. G.R.W., she explained, drove a truck and hauled logs for a living. Because G.R.W. worked during the day and she worked during the night, K.W. said, at least one of them was home to supervise the child at nearly all times. K.W. said that the November 2008 custody judgment provided the mother visitation supervised by the maternal grandmother at the maternal grandparents’ home. K.W. said that she had learned that the mother was not living with the maternal grandparents at certain times; according to K.W., the mother had lived for a time with K.B., her boyfriend and her codeferi-dant on the robbery charge, and with J.T., another male friend, for another period.
*204 K.W. testified that she and G.R.W. had three children of their own: J.W., who was 20 at the time of trial, K.A.W., who was 17 at the time of trial, and S.W. who was 16 at the time of trial. K.W. said that only S.W. still lived at home with the custodians. K.W. also said that S.W. sometimes provided transportation for the child and that she babysat him on occasion.
K.W. denied that either parent offered financial assistance to the custodians. She testified that the child was covered by Medicaid, and she said that the custodians paid for any noncovered medical expenses for the child, like the child’s over-the-counter medications, which K.W. said had cost approximately $200. K.W. admitted that she had never asked the parents for reimbursement of those expenses.
When asked why she had filed the petition to terminate the parents’ parental rights, K.W. explained that the mother was facing sentencing on her robbery conviction at the time the petition was filed and that the father was also a convicted felon; based on those issues, K.W. said, she felt that the child’s custodial situation needed to be “set and final.” When asked whether the custodians had considered other viable options for placement of the child, K.W. said that no one from either parent’s family had “stood up” to take custody of the child since his birth. K.W. specifically focused on the father’s status as a felon, his periods of incarceration, and his history of drug issues as a basis for discounting his ability and fitness to assume custody of the child. She did admit, however, that “as far as she knew” the father had a place to live, transportation, and employment. She also intimated that the mother’s behavior, including her leaving her other three children to be cared for by the maternal grandparents while she spent the night with various people while the father was incarcerated, amounted to a pattern of allowing others to assume responsibility for her children. Thus, K.W. was of the opinion that the mother was unwilling to discharge her responsibilities as a parent.
Some of the testimony at trial also focused on an automobile accident in which the parents had been involved on March 1, 2010. A -witness at the scene of the accident, Sandra Harris, testified that an automobile accident had occurred outside of her home on that date. Harris testified that she did not know either the mother or the father personally. She explained that when she approached the scene of the accident she observed the mother attempting to assist someone out of the automobile. Harris described the mother’s actions and behavior as stumbling around outside the automobile, acting hysterically, and screaming that “they” were trying to kill her. According to Harris, two other women were at the scene and one or both of the women was “verbally abusing” the mother; Harris reported that the women kept repeating that “he did not deserve this.” According to Harris, the mother appeared afraid for her life. Harris said that those women left once she informed them that she had telephoned emergency 911.
Harris said that the mother’s speech had been slurred and that the mother had used Harris’s telephone to contact her family. Harris also said that the mother had mentioned “helping Cody.” Harris said that the driver of the automobile, who she had assumed was the father, had been stuck in the driver’s seat for a time; later, she said, he had been slumped over the hood of the automobile, which had hit a tree.
The mother and the father both testified about the accident as well. The mother admitted that she had been drunk, as did the father. However, both of them said that the father had not been driving the *205 automobile and that a friend named Cody had been the driver. The parents were both taken to the hospital after the accident. At trial, counsel discovered that the mother’s medical records were not included in the hospital records admitted into evidence. The juvenile court and the parties agreed that the evidence would be held open for the admission of the mother’s medical records and that the juvenile court would review the records in camera. Although the mother’s medical records were admitted into evidence and were relied on by the juvenile court, as evidenced by the reference to them in the judgment, only the father’s medical records appear in the record on appeal.
The guardian ad litem, Stephanie Gilli-lan, testified briefly at the conclusion of the trial. She testified concerning her observation of the homes of the various parties. According to Gillilan, the custodians’ mobile home was suitable and the child appeared well adjusted in the home. Gilli-lan also noted that the maternal grandparents’ home, where the mother and her other three children were living, was also suitable and appropriate as a home for the child. Gillilan said that she had also visited the father’s new residence, which she described as clean and appropriately furnished. Gillilan expressed no reservations about the suitability of any of the homes she had visited.
The judgment terminating the parental rights of both parents lists several grounds upon which the juvenile court based its decision. The juvenile court concluded that, regarding the mother, the record contained sufficient evidence of the excessive use of alcohol because the mother’s medical records from her admission to the hospital after the March 2010 automobile accident indicated that she had consumed a six pack of beer and a pint of liquor. The juvenile court further concluded that the mother had failed to provide for the material needs of the child by failing to pay the custodians any amount for the support of the child; that she had shown a lack of effort to adjust her circumstances to meet the needs of the child, as evidenced by her dependence on others, like the maternal grandparents, for housing; and that the mother had been convicted of a felony and was awaiting sentencing on that felony conviction.
Regarding the father, the juvenile court concluded that he, too, had failed to pay support to the custodians for the benefit of the child. The judgment further recited as a basis for termination that the father had failed to adjust his circumstances to meet the needs of the child, as evidenced by his failure to bring the mother and the other three children to live with him at the residence he had established, and that the father had excessively used controlled substances. Finally, the juvenile court determined that the father had been convicted of and imprisoned for a felony.

I. Grounds for Termination

A. The Mother’s Arguments

The mother argues that the custodians did not prove grounds for termination of her parental rights by clear and convincing evidence. Our review of the record, however, convinces us that the custodians presented evidence supporting two grounds for termination of the mother’s parental rights under § 12-15-319(a) — the mother’s failure to pay any support for the child and her excessive use of alcohol. We further conclude that those grounds for termination were supported by clear and convincing evidence.
The mother challenges the juvenile court’s determination that the mother had failed to provide support to the custodians despite her ability to do so. See § 12-15-319(a)(9). The mother did testify that she *206 had provided clothing and that she had offered clothing and other items to the custodians only to have her offers of assistance refused. However, K.W. disputed the mother’s testimony on this point, stating that neither parent had offered any meaningful support to the custodians since the entry of the custody judgment in November 2008. The juvenile court, as the trier of fact, was in the position to weigh the credibility of the respective parties and other witnesses and to determine what were the true facts. See W.P. v. Madison County Department of Human Res., 980 So.2d 1016, 1021 (Ala.Civ.App.2007); see also C.J. v. Marion County Dep’t of Human Res., 5 So.3d 1259, 1271 (Ala.Civ.App. 2008) (quoting Woods v. Woods, 653 So.2d 312, 314 (Ala.Civ.App.1994)) (discussing the ore tenus presumption and the role of the juvenile court judge as the “ ‘sole judge of the facts and of the credibility of witnesses’ ”). The juvenile court’s resolution of the issue in favor of the custodians is protected by the ore tenus presumption, and we may not disturb its determination. W.P., 980 So.2d at 1021. Thus, we conclude that the custodians established, by clear and convincing evidence, this ground for the termination of the mother’s parental rights.
The mother further challenges the juvenile court’s finding that the mother’s excessive use of alcohol rendered her unable to parent the child. The mother argues that the juvenile court’s finding, which, she says, was based on one incident of alcohol abuse in March 2010, was insufficient to establish that she abused alcohol to such an extent as to render her unable to care for the child. We disagree.
We note that the juvenile court, in making its specific finding that the mother had abused alcohol in March 2010, relied on the mother’s medical records from the March 2010 automobile wreck, in which, the judgment states, the mother admitted drinking a six pack of beer and a pint of liquor. Although those medical records are not contained in the record on appeal, we must presume that they support the juvenile court’s findings. See Vaughan v. Oliver, 822 So.2d 1163, 1170 (Ala.2001) (quoting Berryhill v. Mutual of Omaha Ins. Co., 479 So.2d 1250, 1251 (Ala.1985)) (“ ‘Where all the evidence is not in the record, it will be presumed that the evidence was sufficient to sustain the verdict or judgment.’ ”). In addition to the missing medical-record evidence, the testimony of Harris supports a conclusion that the mother was inebriated at the time of the March 2010 accident. The evidence, therefore, established that the mother had abused alcohol in March 2010, a mere two months before the termination trial commenced.
However, in addition to reciting the finding regarding the mother’s abuse of alcohol in March 2010, the juvenile court necessarily determined that the evidence satisfied § 12 — 15—319(a)(2) and that the evidence supported a determination that the mother had excessively abused alcohol and that her abuse of alcohol was “of a duration or nature as to render the parent unable to care for needs of the child.” The juvenile court considered evidence that we do not have in the appellate record, and it had heard evidence concerning the mother’s ability to parent at the trial that resulted in the 2008 judgment awarding custody of the child to the custodians. The juvenile court was free to consider its knowledge of “ ‘the past history of the family as well as the evidence pertaining to current conditions’ ” when considering the termination of the mother’s parental rights. A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (quoting T.B. v. Lauderdale County Dep’t of Human Res., 920 So.2d 565, 570 (Ala. *207 Civ.App.2005)). We cannot conclude, then, that the juvenile court did not have evidence from which it could have properly-concluded that the mother had a longstanding problem with alcohol. In addition, we note that, because the mother, during the period after the termination petition was filed and while she awaited sentencing on felony robbery charge, evinced such clouded judgment as to become so inebriated that she was described as “stumbling” and admitted to drinking a large quantity of alcohol, we cannot agree with the mother that the evidence, as viewed by the juvenile court, was not clear and convincing evidence that she abused alcohol to such an extent as to make her unable to care for the child. Certainly, the mother’s lapse in judgment, coming so close in time to the termination trial, see D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003) (indicating that a juvenile court should base its decision on the termination of parental rights on the current condition of the parents), was evidence from which the juvenile court could have concluded that the mother had not made any effort to adjust her circumstances for the welfare of her child.

B. The Father’s Arguments

Like the mother, the father argues that the juvenile court’s factual findings regarding the grounds for termination were not supported by clear and convincing evidence. Based on our review of the record, we conclude that the evidence presented by the custodians implicates two grounds under § 12-15-319(a) for the termination of the father’s parental rights — the father’s conviction of and imprisonment for a felony and the father’s excessive use of alcohol and controlled substances. Further, our review of the record supports the juvenile court’s conclusion that the custodians established clear and convincing evidence of those grounds for the termination of the father’s parental rights.
The juvenile court relied, in part, on § 12 — 15—319(a)(4), which lists as a potential ground for termination of parental rights that the parent has been convicted of or imprisoned for a felony. The father testified that he had been convicted of five felonies and that he had served out a sentence of incarceration for those felonies after his probation was revoked in May 2009. Thus, the evidence establishes that the father was convicted of and imprisoned for a felony.
The father first argues that the juvenile court was required to consider his current circumstances and not his past circumstances in determining whether termination of his parental rights was warranted. The father is correct that “[t]his court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O., 859 So.2d at 444. However, as noted earlier, we have explained that, “ ‘[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.’ ” A.R., 992 So.2d at 760 (quoting T.B., 920 So.2d at 570). The father’s past criminal history was relevant and was properly considered by the juvenile court. As will be further discussed below, the father’s felony convictions and resulting imprisonment did not become irrelevant merely because the father had completed his sentence. See J.L. v. State Dep’t of Human Res., 961 So.2d 839, 849 & 849 n. 3 (Ala.Civ.App.2007).
The father further argues that, pursuant to W.P., 980 So.2d at 1023, the juvenile court’s reliance on his past convictions is *208 not warranted because the juvenile court should focus on the father’s current circumstances and because the father in the present case, like the father in W.P., has taken steps to adjust his circumstances for the good of the child. However, we noted in W.P. that the conviction the juvenile court relied upon was not established as a felony conviction and that it, and a few other criminal incidents, had occurred three or four years before the termination trial in that case. W.P., 980 So.2d at 1023. In the present case, however, the father was convicted of five felonies only a few years before the termination hearing and he was imprisoned after violating his probation only about one year before the termination trial.
More importantly, however, we have held that a juvenile court may rely on any felony conviction and resulting imprisonment as a basis for terminating parental rights, regardless of when the conviction and imprisonment occurred. J.L., 961 So.2d at 849 & 849 m 8 (noting that former § 26-18-7(a)(4), Ala.Code 1975, the predecessor statute to § 12-15-319(a)(4), “contain[ed] no language limiting the felonies a [juvenile] court should consider only to those for which the parent is currently incarcerated”). Thus, we conclude that the father’s reliance on W.P. is unavailing, as is his argument that the juvenile court erred by failing to consider his current circumstances. The undisputed evidence establishes that the father was convicted of and imprisoned for five felonies; the juvenile court was permitted to rely upon those convictions and resulting imprisonment as a ground for termination of the father’s parental rights.
The record also supports the juvenile court’s conclusion that the father had abused controlled substances. In addition to admitting that he had violated his probation in the spring of 2009 because he had attempted to use another’s urine to pass a drug test because he would have tested positive for the use of marijuana, the father admitted having been drunk at the time of the March 2010 accident. His medical records at the time of the March 2010 accident reflect that he informed a physician that he had a history of both alcohol and drug abuse but that he had not been abusing either in the past “few years” or “year and a half,” a period that is not supported by the other evidence of record, which established that the father had used marijuana in the spring of 2009, when he violated his parole and was sent to prison. Thus, the juvenile court had sufficient evidence from which to determine that the father’s admitted drug and alcohol abuse had not abated but had continued even to the time shortly before the termination trial. Based on the evidence of the father’s current condition, the juvenile court did not err in concluding that the evidence established clearly and convincingly that the father had not adjusted his circumstances for the welfare of the child.

II. Viable Alternatives

Having determined that the evidence clearly and convincingly establishes grounds for termination of the parental rights of both the mother and the father, we now turn to the parents’ arguments that the custodians failed to prove that no viable alternative to the termination of the parents’ parental rights existed. We have long held that any nonparent seeking a termination of parental rights must establish both the dependency of the child and that no viable alternative to termination of parental rights exists under the circumstances. See C.E.W. v. P.J.G., 14 So.3d 166, 170 (Ala.Civ.App.2009). The parents both assert that the maternal grandmother’s offer at trial to take custo *209 dy of the child if the juvenile court were to determine that the parents were not fit to take custody of the child presented a viable alternative to termination of their respective parental rights. Relying primarily on C.E.W., in which this court reversed the termination of a father’s parental rights because the custodian failed to present evidence indicating that no viable alternative to the termination of the father’s parental rights existed, the parents argue that the custodians failed to present evidence indicating that no viable alternative to terminating the parents’ rights existed and that, in fact, the maternal grandmother’s expressed interest at trial in assuming custody of the child if the parents were not permitted to do so was itself a viable alternative.[1] We disagree.
Although this case involves only private parties, we have held in cases in which the Department of Human Resources is a petitioner that testimony presented in a termination-of-parental-rights trial regarding a potential relative resource comes too late in the process for the potential resource to be considered as a viable alternative to termination. C.T. v. Calhoun County Dep’t of Human Res., 8 So.3d 984, 989 (Ala.Civ.App.2008); and B.S. v. Cullman County Dep’t of Human Res., 865 So.2d 1188, 1196-97 (Ala.Civ.App. 2003); see also A.E.T. v. Limestone County Dep’t of Human Res., 49 So.3d 1212, 1215 (Ala.Civ.App.2010) (affirming a juvenile court’s failure to grant a continuance of a termination-of-parental-rights trial so that the father could attend to present live testimony as opposed to deposition testimony because the father, at best, could have presented evidence of only potential relative resources that would have been precluded from consideration because of the “last-minute nature” of the suggestions). In C.T., we explained that the law does not require a juvenile court considering the termination of parental rights to “delay consideration of the termination of a parent’s parental rights because a parent has, immediately before or during a termination hearing, identified a new possible relative resource for the child.” C.T., 8 So.3d at 989. In B.S., we determined that “the mother’s last-minute questioning of [a proposed resource] to determine whether [she] would be willing to serve as an alternate placement for the child, even where [the proposed resource] responded in the affirmative, was not sufficient to constitute a truly viable alternative to the termination of the mother’s parental rights.” 865 So.2d at 1197. Thus, this court has determined that the last-minute proffer of a potential resource for a child’s placement will not suffice to delay the termination of parental rights.
K.W.’s testimony at trial that no relatives of the parents had come forward in the four years since the child’s birth to offer to take custody of him was sufficient to support the juvenile court’s conclusion that no other viable alternative to termination of the parents’ parental rights existed. The last>-minute nature of the maternal grandmother’s offer to assume custody of the child does not undermine the juvenile court’s conclusion. The record does *210 not indicate that the maternal grandmother had offered to take custody of the child at the time of its birth or at any time since the child was placed with the custodians. The custodians, who have reared this child since his birth, desire to give the child permanency and stability, and, in light of the parents’ apparent lack of desire to take responsibility for the child during the first four years of his life, we cannot disagree with the juvenile court’s conclusion that no viable alternative to the termination of the parents’ parental rights existed in the present case. See B.J.C. v. D.E., 874 So.2d 1109, 1118 (Ala.Civ.App.2003), overruled on other grounds by F.G. v. State Dep’t of Human Res., 988 So.2d 555 (Ala. Civ.App.2007) (noting that the custodians who sought termination of parental rights were seeking to give the child “permanency and security” and that maintaining the status quo and permitting the parent additional time to adjust his circumstances was not a viable alternative to termination).
Because the custodians established grounds for termination of the parental rights of both the mother and the father, and because the juvenile court’s determination that no viable alternative to termination of those rights existed is supported by the evidence at trial and is not undermined by the maternal grandmother’s last-minute offer to assume custody of the child, the judgment of the juvenile court terminating the parental rights of the mother and the father is affirmed.
2090869 — AFFIRMED.
2090889 — AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, THOMAS, and MOORE, JJ„ concur.

. The mother also argues that another viable alternative to termination was the return of the child to the parents. However, in light of our conclusion that the custodians proved grounds for termination, returning the child to the parents would not have been a viable alternative for the juvenile court. See T.G. v. Houston County Dep’t of Human Res., 39 So.3d 1146, 1153 (Ala.Civ.App.2009) (affirming the rejection of the option of returning children to the home of the mother as a viable alternative when the mother had been determined to be unable or unwilling to care for the children and grounds for termination of her parental rights existed).