THOMPSON, Judge.
B.J.C. (“the father”) appeals the termination of his parental rights.
*1111 In October 1996, the Jefferson County Department of Human Resources (“DHR”) filed dependency petitions asking the Juvenile Court of Jefferson County (“the trial court”) to determine custody of H.M.A. and H.Y.A. (hereinafter together referred to as “the children”), who were then four years old and two years old, respectively. At that time, the children’s mother, L.A.H., was married to S.L.H. DHR filed its petitions after it learned that S.L.H. was suspected of, and later charged with and convicted for, sexually abusing one of the children. L.A.H. and S.L.H. had one child, T.D.H., who was the children’s half brother. It appears that the trial court ultimately terminated S.L.H.’s parental rights to T.D.H., and no appeal was taken from that termination judgment. It appears that T.D.H. had been in the custody of the maternal grandparents for a number of years.
In its October 1996 petitions, DHR sought to have the children placed in the custody of their maternal grandparents, W.A. and E.A. (“the maternal grandparents”). The father and his parents, B.J.C., Sr. (“the paternal grandfather”), and D.C. (“the paternal grandmother”), sought to intervene and sought an award of visitation with the children. The father’s parents are hereinafter together referred to as “the paternal grandparents.”
In November 1996, the trial court entered orders finding the children dependent and placing the children in the custody of the maternal grandparents; the trial court also awarded the children’s mother and father, and the paternal grandparents, visitation with the children. The record contains no indication that the children have ever been in the custody of DHR.
On January 25, 2002, D.E. and D.E. (“the maternal aunt and uncle”) filed a petition seeking to terminate the father’s parental rights so that they could adopt the children. In those petitions, the maternal aunt and uncle asserted that L.A.H., the children’s mother, had been killed on October 1, 2001. On February 20, 2002, the father filed petitions seeking an award of custody of the children, and the paternal grandmother later filed a letter requesting an award of visitation, or the enforcement of a previous order awarding her visitation with the children.
The trial court conducted an ore tenus hearing on July 19 and July 22, 2002. On September 25, 2002, it entered judgments terminating the father’s parental rights to the children. After a series of post-judgment filings and orders, the father filed one notice of appeal that encompassed both termination judgments.
In their brief on appeal, the maternal aunt and uncle contend that the timing of the judgments and the postjudgment filings in this case render the appeal untimely. A recitation of the dates of those filings and orders is not necessary for the purposes of this opinion. Suffice it to say that the father’s postjudgment motions were untimely, that the father sought additional time to appeal, and that the trial court misapplied the procedural requirements of Rule 77(d), Ala. R. Civ. P., in allowing the father additional time in which to appeal. However, the record on appeal is devoid of any indication that the maternal aunt and uncle opposed the father’s Rule 77(d) motion before the trial court or that they argued to the trial court that it had misapplied Rule 77(d). Although it is clear that, under a proper application of Rule 77(d), the trial court did not have the authority to allow the father additional time to appeal, our supreme court has held that where a party does not oppose before the trial court another party’s Rule 77(d) motion, the appellate courts may not consider the jurisdictional issue of timeliness when the case is *1112 presented for appellate review. Ex parte H.F., 843 So.2d 190 (Ala.2002); Ex parte S.W.T., 782 So.2d 766 (Ala.2000). This court is bound by that precedent and may not dismiss the appeal on the basis that it was not timely filed.
The children were placed in the custody of the maternal grandparents in 1996 after allegations arose that S.L.H., the children’s stepfather, had sexually abused one of the children. S.L.H. was convicted on two sexual-offense charges in connection with his molestation of one of the children. S.L.H. is currently incarcerated, serving a 21-year prison sentence and a 10-year prison sentence; those sentences run concurrently.
At the time of the termination hearing, the children had been in the legal custody of the maternal grandparents for more than six years. The record on appeal contains little information about the children’s mother, other than to indicate that she was killed in October 2001.
In 1997, the trial court awarded the paternal grandmother “reasonable unsupervised visitation” with the children, and it awarded visitation to the father and the paternal grandfather under the condition that that visitation be supervised by the paternal grandmother. The paternal grandmother is a truck driver, and, according to her testimony, she traveled frequently in her employment and spent only a few days each month at home. The paternal grandmother testified that she quit her job as a truck driver in order to allow her to spend more time with the children after the children’s mother died. It appears that, until shortly before the termination hearing, the paternal grandmother and the maternal grandparents were able to work out a schedule to allow her to visit with the children on the days she was at home.
The father has a long history of drug and alcohol addiction. The father was incarcerated on receiving-stolen-property charges from May 2001 through November 28, 2001; he enrolled in a drug-treatment program while in prison. The father maintained at trial that he had stopped using illegal drugs and that he is now a recovering addict. The father testified that he has been attending Narcotics Anonymous or Alcoholics Anonymous meetings since May 2002 and that he has seen a psychiatrist a few times.
The father has provided little support for the children during the six years they have been in the custody of the maternal grandparents, and months or years have passed between the times he did attempt to provide support for the children. In approximately 1998, when the father was employed by the paternal grandfather, the father sent the maternal grandparents $50 per week in child support for T.D.H. and the children; the father admitted that he paid that support for only approximately nine months. In January 2002, shortly after his release from prison, the father paid $750 in child support. At the time of the termination hearing, the father was employed full-time and earned approximately $10 per hour. The father acknowledged, however, that he had made no attempt to pay child support for the children since January 2002.
The father admitted that he had had absolutely no relationship with, and had not visited, the children between 1995 and 1997. The record indicates that the father has visited the children only infrequently since that time. The father has typically visited the children when the paternal grandmother had the children for her visitation. However, the paternal grandmother testified that before his release from prison in November 2001 the father had done little for the children and had rarely *1113 visited them. The paternal grandmother stated that she could see an improvement in the father since his release from prison.
The record contains copies of cards the children have sent to the father in which the children requested that he schedule a visit with them. In one card, one of the children stated that she had forgotten what the father looked like.
The record indicates that a visitation dispute between the paternal grandmother and the maternal grandparents arose in late January or early February 2002.[1] At that time, the maternal aunt and uncle had already filed their termination petition. After two visits with the paternal grandmother in late January or early February 2002, one of the children was very upset about conversations she had had with the paternal grandmother and the father pertaining to the facts of this case. Although there was an order in place that awarded the paternal grandmother reasonable visitation with the children, the maternal grandparents informed the paternal grandmother and the father that they could only visit the children in the maternal grandparents’ home, under their supervision. Both the paternal grandmother and the father testified that, although the children requested that they schedule a visit with them, they elected not to visit the children in the maternal grandparents’ home because, they contended, they were not comfortable in that home. Therefore, other than briefly seeing the children at school one day, the paternal grandmother and the father, at the time of the termination hearing, had not visited the children since late January or early February 2002. Both the paternal grandmother and the father blamed the maternal grandparents for their failure to visit the children during those months. However, on questioning from the trial court, the father acknowledged that it had been his decision to forgo any visitation with the children during that time.
At the time of the termination hearing, the father was living, rent-free, in a residence owned by the paternal grandparents. The paternal grandmother characterized that home as “rundown” and stated that nobody had lived in that home for four years before the father moved into it. The maternal grandmother testified that the roof in that house leaked and that the walls in the bathroom had been ripped out but not yet replaced. The father stated that the living room had been torn down and that he planned to reconstruct it. He also acknowledged that there was no lock on the front door of that house, and that he sometimes left the door to the house wide open even when he was not there.
At the termination hearing, the father admitted that he could not properly provide for or care for the children, and he dismissed his petition seeking custody of the children. The father continued to object to the maternal aunt and uncle’s adopting the children, however. The father admitted that he believed that, in living with the maternal aunt and uncle, he “did not think [the children] could be in better hands.” However, in essence, the father wanted to maintain the right to be a part of the children’s lives so that he could maintain the right to visit them.
When the children’s mother was killed, the maternal aunt and uncle, who had visited the children often when they were living with the maternal grandparents, decided to attempt to adopt the children. They moved from Nashville to Birming *1114 ham and purchased a four-bedroom, three-bath house located near the maternal grandparents’ home. The maternal aunt testified that the children have adjusted well to living with the maternal uncle and her and that they were excited by the change. The children see the maternal grandparents almost daily.
The children are both seeing a counsel- or. Also, the maternal aunt has a bachelor’s degree in psychology and a masters degree in counseling. She has worked with children with emotional and behavioral problems and with elementary-school children. At the time of the termination hearing, the maternal aunt was not working; she stated that she would probably return to work when the children’s younger half brother enrolled in kindergarten.
At the end of the termination hearing, the children’s guardian ad litem recommended that the father’s parental rights be terminated.
Section 26-18-7, Ala.Code 1975, which sets forth the statutory authority for the termination of parental rights, provides:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
“[Listing offenses.]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
*1115 “(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
This court has stated:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Resources, 636 So.2d 419 (Ala.Civ.App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-70»), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the ^ trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
The father first argues that the maternal aunt and uncle were not parties to the original dependency action, and, therefore, that they could not file a petition to terminate his parental rights. A petition to terminate a parent’s parental rights may be filed by “[DHR], any public or private licensed child-placing agency or parent, with permission of the court, or *1116 any interested party.” § 26-18-5(a), Ala. Code 1975 (emphasis added). The father contends that because the maternal aunt and uncle did not intervene in this action and had riot previously been awarded custody of the children, they were not “proper parties” to file a petition to terminate his parental rights. The trial .court stated that it interpreted the term “interested party” in § 26-18-5(a) to mean any person interested in the children’s welfare. We note that in establishing who could file a petition to terminate parental rights, the Alabama Legislature elected to use the words “interested party” rather than “party.” See § 26-18-5(a), Ala.Code 1975 (most recently amended effective April 22, 1998).
This issue has been addressed in another case. In that case, although this court concluded that the issue was not preserved for appellate review, we found that the term, “interested party” in § 26-18-5(a) provided statutory authority to allow foster parents to seek the termination of a parent’s parental rights. N.A. v. J.H., 571 So.2d 1130 (Ala.Civ.App.1990) (“N.A. v. J.H. I”). After this court issued its judgment in N.A. v. J.H. I, the appellants filed in the trial court a Rule 60(b), Ala. R. Civ. P., motion, contending that the termination judgment was void because the termination petition had been filed by foster parents. N.A v. J.H., 581 So.2d 492 (Ala. Civ.App.1991) (“N.A. v. J.H. II”). In reviewing the trial court’s denial of that Rule 60(b) motion, this court noted that the appellants, in filing that motion, were seeking to circumvent their failure to properly preserve that' issue in the first appeal. N.A. v. J.H. II, supra. The court also reiterated that, as to the merits of the interested-party issue, the court had “already addressed the issue ... and ha[d] determined that-the termination proceeding was proper On the petition of the foster parents.” N.A. v. J.H. II, 581 So.2d at 493. Given that authority, in which this court determined that foster parents were “interested parties” who could file a petition to terminate parental rights, we cannot say that the father has demonstrated that the trial court in this case erred in concluding that the maternal aunt and uncle were interested parties entitled to file a termination-of-parental-rights petition pursuant to § 26-18-5(a).
The father also argues that the trial court erred in terminating his parental rights. In its termination judgments, the trial court made detailed findings of fact pertaining to the father’s history • during the six years the children have been in the custody of their maternal relatives. The trial court cited the father’s “long history of drug and alcohol addiction”; his lack of a stable residence; his failure to provide more than occasional financial support for the children in spite of his maintaining full-time employment; his failure to maintain a relationship with the children for years; and his visiting them only “rarely” in the recent past. The trial court concluded that the father is, and would be for the foreseeable future, unable to discharge his parental responsibilities and that there were no viable alternatives to the termination of the father’s parental rights.
In his brief on appeal, the father argues that the evidence does not support a finding of his abandonment of the children, and, therefore, he argues, the trial court’s judgment should be reversed. The trial court, however, did not rely on the theory of abandonment in reaching its judgment. We conclude that other grounds listed under § '26-18-7, Ala.Code 1975, support the trial court’s termination judgments, and, therefore, we do not reach the issue whether the father’s conduct amounted to abandonment under § 26-18-7(c), Ala. Code 1975.
*1117 The father contends that he did provide support for the children. However, his own testimony established that he paid regular support of $50 per week for only approximately nine months in 1998, and that he paid a total of $750 in support in January 2002. The children have been in the custody of their maternal grandparents since late 1996. The father admitted that, other than during the nine-month period in 1998 and in January 2002, he had paid no support, although he was employed full-time for almost all of the time the children were in the maternal grandparents’ custody. The father admitted at the July 2002 termination hearing that he had made no effort to pay child support for the children after January 2002. The evidence supports the trial court’s conclusion that the father had failed to consistently support the children.
The father also contends that the maternal aunt and uncle should not be “allowed to benefit” from the actions taken by the maternal grandparents that, he maintains, prevented him from visiting the children. The father has a history of failing to visit the children. The maternal grandmother testified that the only way she knew if the father had visited the children during their visitation with the paternal grandmother was if the children reported to her that they had seen him. The maternal grandmother stated that the children reported visiting with the father only infrequently. The paternal grandmother testified that, before he went to prison in May 2001, the father rarely visited the children and that he had done very little for them.
One of the children became very upset after the visits in late January or early February 2002 with the paternal grandmother and the father during which the paternal grandmother and the father discussed this case with the children. In response, the maternal grandparents specified that any future visitation until the next court hearing would have to be supervised. The father did not attempt to visit the children at the maternal grandparents’ home. The trial court pointed out to the father that the offered supervised visitation was not “about [the father],” and that it was “about [the children].” The father agreed, and he also admitted that the children had indicated that they would like him to schedule a visit. However, the father stated that he had elected not to visit the children because he believed he would feel uncomfortable visiting the children in the maternal grandparents’ home.
The father insists in his brief on appeal that his failure to visit was not his fault because, he maintains, the maternal relatives prevented his visitation. However, the record demonstrates that the period in which the father contended that the maternal grandparents had prevented him from visiting lasted only from late January or February 2002 to July 2002. The father offers no explanation for his failure to consistently visit the children during the six years they had been in the maternal grandparents’ custody. Further, during the period between late January or early February 2002 and the July 2002 termination hearing, the father elected, in order to avoid his own discomfort, not to visit the children at the maternal grandparents’ home. The trial court’s comments during the hearing support a conclusion that the trial court did not find the father’s choice not to visit the children to be consistent with the father’s claims that the maternal grandparents were at fault for his lack of visitation with the children.
The father also contends that there were viable alternatives to the termination of his parental rights. The father contends that the petitioners, the maternal aunt and uncle, were themselves viable *1118 alternatives to the termination of his parental rights. In other words, the father advocates maintaining the situation the children had been in for the six years before the termination hearing by leaving them to be -raised by family members. The father testified only that he wanted to remain a part of the children’s lives and to be able to visit them. He did not know when, if ever, he would be capable of adjusting his own circumstances in order to meet the needs of his children.-
In A.N.S. v. K.C., 628 So.2d 734 (Ala.Civ.App.1993), a maternal aunt and uncle petitioned to terminate the parental rights of an incarcerated father. The father testified that he might be released from prison seven years after the termination hearing in thát case. In rejecting the father’s argument that the maternal aunt and uncle were viable alternatives to the termination of his parental rights, this court found that “[t]he only alternative available to the trial court was to maintain the status quo,” but that “[t]he maternal aunt and uncle were willing to adopt the children to give them a feeling of permanency and security.” A.N.S. v. K.C., 628 So.2d at 735. This court affirmed the trial court’s termination judgment.
Similarly, in this case, the father advocates only maintaining the status quo, and he has no idea whether or when he might be able to adjust his circumstances to meet the children’s needs. See A.N.S. v. K.C., supra. The evidence supports the trial court’s determinations regarding the status quo in this case: that the father has failed to consistently support the children or maintain visitation with them, that he failed to consistently provide for the children’s support, and that his situation is not likely to improve in the foreseeable future. The evidence also supports the trial court’s determination that the maternal aunt and uncle can provide the “safe and stable home environment” that the children need and that such a home would be in the children’s best interests. Given the record on appeal, we cannot say -that the trial court abused its discretion in entering its judgments terminating the father’s parental rights. A.R.E. v. E.S.W., supra; M.H.S. v. State Dep’t of Human Res., supra.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., dissent.

. Although the maternal aunt and uncle had physical custody of the children at that time, they deferred to the maternal grandparents, the children’s legal custodians, to make decisions regarding visitation matters with the father and the paternal grandmother.