47 So.3d 1241 (2009)
L.T.
v.
W.L. and T.L.
No. 2080369.
Court of Civil Appeals of Alabama.
November 6, 2009.
Rehearing Denied January 22, 2010.
Certiorari Denied April 9, 2010 Alabama Supreme Court 1090592.
*1242 Barry C. Leavell of Leavell & Associates, Attorneys at Law, L.L.C., Northport, for appellant.
Kenneth E. Gibbs and Harold S. Patrick of Gibbs, Patrick & Sears, LLP, Opelika, for appellees.
THOMAS, Judge.
L.T. ("the mother") has four children. Her third child, C.K. ("the child"), was born prematurely in July 2003. In October 2003, while the mother was pregnant with her fourth child, W.L. ("the maternal grandfather") and T.L. ("the maternal stepgrandmother") (collectively referred to as "the maternal grandparents"), in response to pressure from family members and involvement by the Montgomery County Department of Human Resources ("DHR"), began caring for the child overnight and on weekends. During the week, the maternal grandfather would take the child to the mother's residence so that the mother could care for the child during the day.
However, this arrangement was discontinued in December 2003, after the child was repeatedly returned to the maternal grandparents wearing the same diaper that had been placed on her that morning. The child's bottom was raw as a result of the mother's failure, even after instruction, to properly tend to diaper changes. In addition, according to the maternal stepgrandmother, the child was failing to thrive, having lost weight and having contracted a scalp fungus.
The child continued to reside with the maternal grandparents throughout 2004, with little involvement from the mother. In March 2005, the maternal stepgrandmother filed a dependency petition seeking legal custody of the child; that action was *1243 assigned case number JU-05-036.01. The petition was granted; however, the mother maintains that she was never served with the dependency petition or given notice of the March 2005 hearing in the dependency action.
In March 2007, the maternal grandparents filed a petition seeking the termination of the mother's parental rights; that action was assigned case number JU-05-036.03. The mother and V.L., the child's maternal great-grandmother, filed separate petitions seeking custody; those petitions are not contained in the record on appeal. The mother, in case number JU-05-036.03, also filed a Rule 60(b), Ala. R. Civ. P., motion seeking to set aside the default judgment in the March 2005 dependency action.
In July 2008, the juvenile court held a hearing on the competing petitions. The mother, the maternal stepgrandmother, the maternal grandfather, and the maternal great-grandmother testified at the hearing. The overwhelming tendency of the evidence was that the mother had simply abdicated her parental responsibilities to the child to the maternal grandparents.
The mother testified that the child first went to stay with the maternal grandparents when DHR asked her family for assistance during her fourth pregnancy, which was a high-risk pregnancy. According to the mother, the child only spent weekends with the maternal grandparents from October 2003 to some time in early 2005. She explained that the maternal stepgrandmother would not let the mother take the child home after an Easter gathering in 2005, resulting in an altercation between the mother and the maternal stepgrandmother. The mother denied having knowledge at that time that the maternal grandparents had received a judgment awarding them custody of the child in March 2005.
At the hearing in July 2008, the mother admitted that she had tested positive for THC, the chief intoxicant in marijuana, in August 2007. She testified that she had worked at three different places of employment during the year preceding the hearing and that she had worked at each of them for between two and four months. Despite indicating that she had been employed for at least part of the time the child was in the custody of the maternal grandparents, the mother admitted that she had not paid any child support due under the 2005 custody judgment. She did say that she had sent some items of clothing for the child but that they had been returned to her. The mother further admitted that she had had no contact with the child from Easter 2005 to Thanksgiving 2006 and again from Thanksgiving 2006 to August 2007. The mother explained that her failure to contact or communicate with the child had resulted from her belief that another family member had secured a restraining order against her.
The maternal great-grandmother, who was 65 years old at the time of trial, explained that she had filed a petition seeking custody of the child because she believed that, if the mother did not have custody, she would be the next logical choice for custody because she had had legal custody of the mother when she was a minor. According to the maternal great-grandmother, she had had custody of the mother because the mother's parents, one of whom is the maternal grandfather, had been unfit due to drug use. The maternal great-grandmother indicated that she had cared for the mother's oldest child on a very frequent basis since his birth and that the mother's second oldest child frequently *1244 stayed with her as well; the evidence indicated that those two children stayed with the maternal great-grandmother on a nearly constant basis at the time of the July 2008 trial. She also testified that the maternal grandfather and the mother had smoked a drug of some type in her backyard one to two years before the July 2008 trial; the maternal grandfather denied smoking any drug and had passed a drug test.
The maternal grandfather testified that he had become involved with the child when DHR contacted him about complaints it had received about the mother in the fall of 2003. Although DHR originally requested that he take custody of all three of the mother's children, the maternal grandfather said that he had responded that he and his wife could not take on the responsibility of caring for three young children at that time. Because the older two children had been frequently cared for by the maternal great-grandmother, who was willing to continue to assist the mother, the maternal grandfather had agreed to assume responsibility for the child, who was an infant. The maternal grandfather said that the decision to take the child was prompted by the fact that being up at night caring for a three-month-old infant was difficult for the maternal great-grandmother.
When questioned about contact between the mother and the child since the maternal grandparents had taken custody of the child, the maternal grandfather responded by explaining that the mother had not contacted the child at all. In addition, the maternal grandfather noted that the mother had not provided any monetary support or personal-care items for the child. According to the maternal grandfather, even on the rare instance when the mother was in the presence of the child, like at a May 2008 birthday party for the maternal grandfather, the mother only spent 5 to 10 minutes with the child. The maternal grandfather stated that the two telephone calls the mother had made to the maternal grandfather since August 2007 did not include a request to speak with the child.
When asked why he had decided to petition for a termination of the mother's parental rights, the maternal grandfather mentioned the desire to provide the child with all the benefits she would be entitled to if he adopted her. The maternal grandfather said that he would not be opposed to continuing to have custody of the child while the mother improved her ability to care for the child. However, he noted that the mother had shown no interest in the child and that her failure to visit with the child indicated to him that she did not care about the child.
The maternal stepgrandmother testified that she had been quite concerned about the health of the child when the maternal grandparents first became involved in her care in October 2003. She said that they intended to assist the mother until she was better able to care for the child. According to the maternal stepgrandmother, her experience as a labor and delivery nurse caused her to suspect that the child, who had been born prematurely, was not receiving the special care she required and might be suffering a failure to thrive. Specifically, the maternal stepgrandmother noted that the child's skin was especially sensitive and that the child required frequent diaper changes to protect her skin; however, as noted above, the mother did not change the child's diaper even once during the day, resulting in a raw, sore, and even bleeding bottom.
The maternal stepgrandmother said that at first she had tried to maintain a bond *1245 between the mother and the child. She said that the child knew the mother was her mother; however, the maternal stepgrandmother admitted that the child called her "mama." The maternal stepgrandmother said that, in the earlier months of the maternal grandparents' care of the child, the maternal stepgrandmother had telephoned the mother to allow the child to say things to her over the telephone. This practice ended, said the maternal stepgrandmother, when the mother's telephone service was suspended or terminated.
When questioned regarding the Easter 2005 altercation, the maternal stepgrandmother explained that she had objected to the mother's taking the child home with her. The maternal stepgrandmother said her objections had been based on the safety of the child because, at the time, the mother's automobile was overcrowded with passengers already, the mother had no child safety seat for the child to ride in, and it was dark and rainy outside. She said that she had taken the child from the mother and that she might have pushed the mother toward the door while telling her to leave. Although she admitted that she told the mother that she could return when she could "respect the house," the maternal stepgrandmother said that she did not mean that the mother could not ever return, but only that she could return when she showed the proper respect for the maternal stepgrandmother and her rules.
When she was asked why she had filed the petition seeking to terminate the mother's parental rights, the maternal stepgrandmother said that she was motivated by the need for stability in the child's life. The maternal stepgrandmother admitted that she had not been in the mother's home or around the mother for two years, so she could not know whether the mother had improved her lifestyle. However, according to the maternal stepgrandmother, maintaining steady employment was not the mother's strong point.
After the July 2008 trial, the juvenile court entered a judgment denying the mother's motion to set aside the March 2005 judgment, denying the mother's and the maternal great-grandmother's petitions for custody, and deferring a ruling on the termination petition. The juvenile court outlined the steps for the mother to take between the entry of the July 14, 2008, judgment and the December 15, 2008, review hearing set in the juvenile court's judgment. Those steps included passing two random drug tests, completing parenting classes, exercising visitation as set out in the judgment, and paying $50 per month in child support, $10 of which was to be applied to the child-support arrearage accumulated between March 2005 and July 2008.
On December 15, 2008, the juvenile court held the review hearing contemplated by the July 2008 judgment. The mother failed to attend that hearing. She was, however, represented by counsel. The juvenile court requested that the mother's counsel provide evidence regarding the mother's compliance with the July 2008 judgment. The mother's attorney admitted that she had no proof that the mother had completed parenting classes; admitted that the mother had not taken any random drug screens; admitted that, to her knowledge, the mother had not availed herself of more than one visit with the child, although she said that the mother had indicated that she had had difficulty contacting the maternal grandparents to arrange visitation; and admitted that the mother had not paid any child support. *1246 The maternal stepgrandmother testified, reiterating the mother's failure to comply with those requirements of the July 2008 judgment as well. The juvenile court entered a judgment terminating the mother's parental rights. From that judgment the mother timely appeals.
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)."
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004). A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). The juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App.1995). Furthermore, when the juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court has made those findings necessary to support its judgment, provided that those findings are supported by the evidence. D.M. v. Walker County Dep't of Human Res., 919 So.2d 1197, 1210 (Ala. Civ.App.2005).
Section 26-18-7(a), Ala.Code 1975,[1] specified the grounds for terminating parental rights:
"If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
In deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child, the juvenile court may consider several factors, including whether the parent abuses alcohol or controlled substances so as to render him or her incapable of caring for the child, § 26-18-7(a)(2), whether the parent has abused the child, § 26-18-7(a)(3), and whether reasonable efforts to rehabilitate the parent have failed, § 26-18-7(a)(6). When a child is not in the custody of his or her parent, a juvenile court must consider, but is not limited to, the following factors:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.

*1247 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
Ala.Code 1975, § 26-18-7(b).
In its judgment terminating the mother's parental rights, the juvenile court found that the mother was unable or unwilling to discharge her responsibilities to the child and that the mother's condition was unlikely to change in the foreseeable future. The court specifically determined that the mother had failed to adjust her circumstances to meet the needs of the child, that the mother had failed to support the child on a regular basis, and that the mother had failed to maintain regular contact with the child. The juvenile court further found that it had given the mother ample opportunity to rehabilitate herself but that the mother "had failed to do so or to demonstrate any desire to do so." Finally, the court found that no less drastic alternatives that would serve the child's best interest were available and that it would be in the child's best interest that the mother's parental rights be terminated so that the child could have "long term stability with a family who can consistently love, care and provide for her."
The mother's first argument concerns the juvenile court's failure to set aside the 2005 dependency and custody judgment on her Rule 60(b) motion. The mother's motion was based on her assertions that she had not been provided notice of the hearing and had not even been served with the petition in the dependency action. However, the mother fails to cite any authority regarding the standard applicable to her motion. Because she fails to support her argument on appeal with citations to proper authorities, see Rule 28(a)(10), Ala. R.App. P., we have no alternative but to affirm the judgment of the juvenile court insofar as it denied the mother's Rule 60(b) motion. Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App. 1996) (stating that "[t]his court will address only those issues properly presented and for which supporting authority has been cited" (emphasis added)).
The mother's second argument is that the evidence presented at trial does not support the termination of her parental rights. The mother challenges both the quantum of evidence, arguing that the evidence was not clear and convincing, and the tendency of the evidence, arguing that the evidence fails to prove dependency of the child or that no viable alternatives to the termination of her parental rights existed. We disagree.
As part of her argument that the evidence did not establish dependency, the mother complains that the juvenile court made a determination regarding the child's dependency at the time of the filing of the original dependency action in 2005 and not at the time of the termination hearing. The juvenile court did determine that the child was dependent in 2005. However, we do not agree with the mother that the juvenile court failed to determine whether the child remained dependent at the time of the termination trial. The juvenile *1248 court's findings supporting its termination judgment clearly establish that the child remained dependent due to the characteristics and habits of the mother.
The main emphasis of the mother's argument on appeal is that the evidence at trial did not prove dependency because the evidence did not establish any "failings" on her part as a mother. However, the flaw in the mother's argument is that grounds for terminating parental rights are not limited solely to issues involving drug or alcohol dependence or unsanitary living conditions. Although the juvenile court did not find that the mother had abandoned the child, her conduct toward the child comes close to abandonment, and abandonment has long been a statutory basis for the termination of parental rights. § 26-18-7(a)(1). The failure of the mother to provide support for the child and her failure to visit or maintain anything resembling communication or contact with the child are also "failings" of the mother that can be used as bases for terminating parental rights. § 26-18-7(b)(1), (2), and (3).
The mother fails to recognize that she need not be unable to parent her child when the evidence demonstrates that she is unwilling to discharge her responsibilities to and for the child. See R.S. v. R.G., 995 So.2d 893, 905 (Ala.Civ.App.2008) (Moore, J., concurring in the result). As Judge Moore explained in his opinion concurring in the result is R.S., although a parent might well be able to parent his or her child, when "clear and convincing evidence demonstrate[s] that he [or she] [is] obviously not willing to discharge his [or her] parental responsibilities" a termination of parental rights may well be warranted. R.S., 995 So.2d at 905. Like the mother in this case, the father in R.S. had not made any effort to support his child and "was content to leave the custody and care of the child to the maternal grandparents" for almost two years. Id. at 905. Although the mother in the present case did finally bring a custody petition to request the return of the child to her custody in 2007, it appears that she did so after being warned that the maternal grandparents intended to file their petition to terminate her parental rights. Before that time, the mother took no steps to assert her parental rights to the child and did nothing to discharge her parental responsibilities.
The evidence at trial clearly indicated that the mother took little interest in the child after the maternal grandparents took over parenting duties for the child in October 2003. The mother failed to visit the child other than on a few rare occasions between December 2003 and December 2007 and did not provide for the child's support in any meaningful manner, although she might have sent a few items of clothing on occasion. The child was clearly dependent due to the mother's lack of concern for the child's welfare and the mother's failure to make any effort to maintain contact or communication with the child, despite being given a final opportunity to do so after the entry of the July 2008 judgment.
The mother next argues that the record indicates that the evidence failed to establish her current conditions, which, she contends, fails to satisfy the requirement that a judgment terminating parental rights be based on clear and convincing evidence. See, e.g., D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003) ("This court has consistently held that the existence of evidence of current conditions or conduct relating *1249 to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence."). However, in cases like D.O., the evidence at trial had established that the parent was making progress toward rehabilitation and reunification at the time of the termination trial and that the evidence of his or her earlier history did not adequately portray the parent's current, improved ability to parent his or her child. See D.O., 859 So.2d at 444 ("The trial court's decision to terminate the mother's parental rights was premature, considering the evidence indicating that the mother has made a continuing effort to change her circumstances and that she was making significant progress at the time of the termination hearings."). In contrast, the evidence at the trial in this case did not show any improvement in the mother's desire to serve as a parent for the child. Instead, the tendency of the evidence was that the mother does not have the desire to make any efforts to assume parental responsibility for the child. In the July 2008 judgment, the juvenile court set out for the mother what would be expected of her in order to convince the court that termination of her parental rights was not warranted, and the mother failed to complete even one of the requirements of the July 2008 judgment. That evidence proves that the mother's current condition was one of apathy, unconcerned that her parental rights to her child would be terminated for her failure to act.
To the extent the mother argues that the evidence failed to demonstrate that no viable alternatives to termination existed, we note that the mother provided no alternatives in her arguments to this court. She only asserts that the maternal grandparents failed to prove that none existed. However, if the mother is arguing that maintaining the status quo would be a viable alternative to termination of her parental rights, we note that we have previously rejected such a contention when grounds for termination exist and the situation is such that, in the foreseeable future, reunification will not be possible. See K.A.P. v. D.P., 11 So.3d 812, 820 (Ala. Civ.App.2008) (rejecting maintenance of the status quo when it appeared that potential reunification would be at least 10 years in the future and commenting that, in order to achieve stability and continuity for children, "appellate courts generally hold that maintaining an indefinite custody arrangement with a third party is not in the best interest of the child"); B.J.C. v. D.E., 874 So.2d 1109, 1118 (Ala.Civ.App. 2003), overruled on other grounds, F.G. v. State Dep't of Human Res., 988 So.2d 555 (Ala.Civ.App.2007) (rejecting the father argument that "maintaining the situation the children had been in for the six years before the termination hearing by leaving them to be raised by family members" was a viable alternative to termination when the father had failed to consistently support or visit with the children and his situation was unlikely to change in the foreseeable future); A.N.S. v. K.C., 628 So.2d 734, 735 (Ala.Civ.App.1993) (rejecting the maintenance of the status quo as an alternative to termination and noting that the father was expecting to be released from prison in seven years but that "[t]he maternal aunt and uncle were willing to adopt the children to give them a feeling of permanency and security"). Based on the mother's failure to put forth any effort to assume her parental responsibilities to and for the child and based on the fact that the lack of contact and communication *1250 between the mother and the child evidences a lack of a parent-child bond between the two, we agree with the juvenile court's implicit conclusion that maintaining the status quo in the present case would not be a viable alternative to termination of the mother's parental rights.
Finally, the mother argues that the termination judgment was based on the convenience of the maternal grandparents as a means to end familial conflict. Both our supreme court and this court have reversed judgments terminating parental rights when the basis for the termination was merely the convenience of the parties. See Ex parte Brooks, 513 So.2d 614, 617 (Ala.1987), overruled on other grounds by Ex parte Beasley, 564 So.2d 950 (Ala. 1990); S.D.P. v. U.R.S., 18 So.3d 936, 942 (Ala.Civ.App.2009); and State ex rel. McDaniel v. Miller, 659 So.2d 640, 642 (Ala.Civ.App.1995) (reversing a judgment terminating the father's parental rights entered on an agreement of the parties and rendering a judgment denying the parents' joint petition to terminate the father's parental rights). In Ex parte Brooks, for example, our supreme court pointed out that the parents' agreement to terminate the father's parental rights would waive the child's right to receive support from and to inherit from his father without bestowing on him any perceivable benefit. Ex parte Brooks, 513 So.2d at 617; see also Miller, 659 So.2d at 642 (noting that the termination of the father's parental rights had been accomplished merely for the convenience of the parties without consideration for any of the child's rights to current and future support or inheritance).
We do not find those cases to be applicable to this situation, however, because the parties are not in agreement to terminate the mother's parental rights for the sake of convenience and because the evidence reveals that the child's best interests would be served by a termination of those rights. Unlike the situations present in Ex parte Brooks and Miller, where the children were going to be relying solely on their mothers for their support and were not receiving any benefit in return for giving up the right to be supported by their fathers, the child in the present case will be gaining a permanent home where she will be provided for both emotionally and materially by her maternal grandparents.
Because clear and convincing evidence adduced at the July 2008 and the December 2008 hearings support the juvenile court's conclusion that the mother is unable or unwilling to discharge her parental responsibilities to and for the child and that her conduct or condition is unlikely to change in the foreseeable future, we agree that grounds for terminating of the mother's parental rights existed. In addition, the evidence supports the conclusion that no other viable alternative would best serve the interests of the child and that the child's best interests are served by the judgment terminating the parental rights of the mother. The judgment terminating the mother's parental rights is therefore affirmed.
AFFIRMED.
PITTMAN and BRYAN, JJ., concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.
NOTES
[1] By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered Ala.Code 1975, § 26-18-7, and enacted the Alabama Juvenile Justice Act ("AJJA"), codified at Ala.Code 1975, § 12-15-101 et seq. The effective date of the AJJA is January 1, 2009; the mother has not asserted that the AJJA applies in this case.