WELCH, Judge.
T.D.F., a juvenile, was adjudicated delinquent based on the juvenile court's finding that he committed the offenses of second-degree assault, JU-13-378.16, a violation § 13A-6-21(a)(4), Ala. Code 1975, and resisting arrest, JU-13-378.17, a violation of § 13A-10-41, Ala. Code 1975.[1] The juvenile court placed T.D.F. on probation and ordered T.D.F. to complete the Pathway Residential Treatment Program. Probation was to be reviewed in six months. This appeal followed.
Facts
Officer Christopher Thompson with the Dothan Police Department testified that on April 7, 2017, at approximately 4:50 p.m., he and Officer Lindsay Holloway, who were patrolling in separate vehicles, responded to an emergency 911 call made by S.F. reporting her son, T.D.F., as being a disorderly juvenile. Officer Holloway arrived at S.F.'s home, on Darlington Circle, before Officer Thompson. After speaking with S.F., Officer Holloway contacted Officer Thompson and told him that T.D.F. had left S.F.'s home on foot and was walking toward 3rd Avenue carrying two red suitcases.
Officer Thompson testified that he and Officer Holloway originally wanted only to find T.D.F. and talk to him to find out what was going on and to find out if he was running away from home. The officers knew that T.D.F. had a juvenile probation officer; they intended to contact T.D.F.'s probation officer to see what needed to be done, depending on the situation. Officer Holloway located T.D.F. on Donna Drive. When Officer Thompson arrived at that location, he observed Officer Holloway outside her vehicle and T.D.F. walking away from her while she was ordering him to talk to her. Officer Thompson drove his vehicle past T.D.F. and Officer Holloway to the next intersection to block T.D.F. from walking away. When Officer Thompson got out of his vehicle, "[T.D.F.] began yelling 'f*ck y'all'.... He was out in the middle of the street doing that." (R. 27.) Officer Thompson affirmed that "[y]elling 'f*ck y'all' to the police is not illegal." (R. 28.) Officer Thompson stated that he
"informed [T.D.F.] to 'come here' so [he] could talk to him. [T.D.F.] refused. [T.D.F.] started using very colorful language. Again, I told him to come here again. I grabbed the tail of his shirt. At that point [T.D.F.] became very aggressive, started flailing his arms, and at some point Officer Holloway was struck."
(R. 14.) Officer Thompson stated that he was authorized to lay hands on T.D.F. because T.D.F. was given a lawful order to stop and did not comply.
"Q. [Defense Counsel:] ... Is that something that you're allowed to do as a police officer, to put hands on somebody?
"A. [Officer Thompson:] Yes, ma'am. I gave him a lawful order to stop so that we can investigate a potential crime.
"Q. And the potential crime being?
*112 "A. He was a runaway juvenile, off of his medication, acting disorderly, possibly involved in domestic violence."
(R. 24.)
Officer Thompson explained that, "once [he] grabbed [T.D.F.'s] shirt, ... that's when the physical response from [T.D.F.] happened." (R. 25.) "Immediately when [T.D.F.] began flailing his arms and continuing to yell profanities, [Officer Thompson] informed him that he was going to be placed under arrest." (R. 26.) Officer Thompson testified that there was no time to tell T.D.F. what he was under arrest for because everything happened quickly. However, Officer Thompson also testified that he told T.D.F. that he was under arrest for disorderly conduct. However, Officer Thompson stated that T.D.F. was told to stop resisting so the officers could investigate whether he was a runaway juvenile who was off his medication and also, possibly involved in domestic violence. "[T.D.F.] struck Officer Holloway and continued to throw punches at both of [the officers]." (R. 15.) T.D.F. punched Officer Holloway in her face with his fist. T.D.F. was "flailing violently." (R. 16.) Officer Thompson was able to get one handcuff on T.D.F.'s right wrist before all three individuals fell to the ground in the middle of street. T.D.F. was cursing the entire time. Officer Thompson guessed that it took possibly as long as two minutes to gain control over T.D.F. Officer Holloway was injured during the melee. Ultimately, T.D.F. was taken to the Dothan Police Department to talk with an investigator, but he refused.
Officer Holloway with the Dothan Police Department stated that on April 7, 2017, she was dispatched to Darlington Circle as Officer Thompson's backup officer. She arrived before Officer Thompson and she spoke with S.F.
"My understanding was that [T.D.F.] came home from school, I believe, and [S.F.] said that he was not acting right. [T.D.F.] had been throwing things around the house and she said he was going to leave. He was going to pack his bags and leave. She said he was not on his medicine[2] .... I asked her if she wanted me to bring him back to the house if I made contact with him, and she said, 'No,' she did not want him there."
(R. 36.) Officer Holloway assumed that, because S.F. did not want T.D.F. returned home, she wanted the officers to contact T.D.F.'s probation officer. Officer Holloway clarified that S.F. "never" said anything about domestic violence or indicated that she wanted T.D.F. arrested. (R. 37.) Officer Holloway said that, because she thought [T.D.F.] was off of his medication, there needed to be a welfare check on him to make sure he was okay and that that was what she intended to do. Officer Holloway testified that S.F. did not tell her that S.F. had called the police a second time to inform the dispatcher that the officers were no longer needed because the situation had resolved itself and that T.D.F. was going to stay with his aunt.
Officer Holloway left S.F.'s house and soon saw T.D.F. walking with his suitcases in the street on Donna Drive. Officer Holloway stated that she parked her vehicle "catty-corner" to T.D.F.'s path and got out of her vehicle. (R. 30.) She saw Officer Thompson arriving. When she got out of her vehicle, she "attempted to contact [T.D.F.]," but he started "cussing at [her], yelling 'F you.' " (R. 30.) Meanwhile, Officer Thompson parked his vehicle "about four car lengths" in front of T.D.F., who was still walking down the street away from Officer Holloway toward Officer Thompson. (R. 30.) T.D.F. stopped about *113 10 feet in front of Officer Thompson's vehicle. T.D.F., "threw the suitcases down and tried to take off when [the officers] were trying to get him to come talk to [them]." (R. 31.) "Officer Thompson pulled the back of [T.D.F.'s] shirttail to try to get him to stop, and that's when the fight started." (R. 31.)
"Officer Thompson and [T.D.F.] started fighting. [Officer Thompson] tried to get his arm behind [T.D.F.] and place [T.D.F.] under arrest, and so I went to attempt to grab the other arm-I believe it was [T.D.F.'s] left arm. So there was one of us on each side and we just-we could not get [T.D.F.] to the ground. Every time we would tell him to stop resisting, he would fight a little harder."
(R. 31.) Officer Holloway believed that Officer Thompson advised T.D.F. that he was under arrest. Officer Holloway testified that T.D.F. was being arrested for disorderly conduct because he had failed to obey a lawful order from Officer Thompson. While the officers attempted to get the handcuffs on T.D.F., T.D.F. struck Officer Holloway on her right jaw with his fist. Immediately, she could not hear from her right ear, and her hearing did not return for two weeks.[3] She had to go to the emergency room immediately following the incident and then see a doctor two or three times over a three-week period. She also had an "extremely bruised collarbone," a bruised tail bone, and scratches on her knees and elbows. (R. 32.) Additionally, her Costa brand sunglasses were broken and her G-Shock brand watch was shattered.
The State rested its case, and T.D.F. moved for a judgment of acquittal, arguing that there had been no prima facie case of criminal mischief and disorderly conduct. The juvenile court granted the motion as to the criminal-mischief charge but deferred ruling on the disorderly-conduct charge.
T.D.F. testified that when he came home from school on April 7, 2017, he was mad and he got "into it" with his grandmother who was at his home-it was not physical. Because he was mad, he decided to go to his aunt's house. He had his clothes and a game in his suitcases and he planned to stay the weekend with his aunt. His mother, S.F., knew those were his plans, and she had no objection. When he encountered the police on Donna Street, Officer Holloway pulled up, and he just looked at her and kept walking. T.D.F. denied that he dropped his suitcases and tried to run from the officers. He said that Officer Thompson got in front of him, and T.D.F. did not want to talk to the officers, so he tried to walk away, but according to T.D.F., Officer Thompson grabbed him without saying anything to T.D.F. When Officer Thompson grabbed T.D.F.'s shirt, Officer Holloway grabbed his leg. Then the officers were trying to talk, but T.D.F. told them that he did not have to talk to them. Then, the officers began trying to handcuff T.D.F., and T.D.F. stated that he was not going to be handcuffed because he knew he had not done anything wrong. T.D.F. said a third officer, Officer Jay Arnold, arrived and choked him, and that's when he began using profanity and when they got the handcuffs on T.D.F. He was never told that he was under arrest, and the officers never said he was being disorderly or resisting arrest. He did not throw any punches during his struggle with the officers, and specifically, he testified, he did not punch Officer Holloway.
*114 S.F. testified that on April 7, 2017, T.D.F. was 16 years old. She telephoned for the police because T.D.F. was mad and was being loud. She explained that T.D.F. was mad because his grandmother had forgotten to pick him up from school and he had had to walk home. S.F. told the dispatcher to send an officer to her house. By the time S.F. got off the telephone, T.D.F. had calmed down, so S.F. telephoned his aunt and arranged for T.D.F. to go to the aunt's house. S.F. called the emergency 911 dispatcher again and told her not to send the police because the situation had been resolved, but the dispatcher said she was sending an officer anyway. S.F. also explained that T.D.F. had probably not taken his medicine, but that it was not working as well as it used to and probably needed adjusting. S.F. testified that she did tell Officer Holloway about her second call to emergency 911 canceling her request for an officer. S.F. did not say that T.D.F. was a runaway or that he had committed a crime or done anything to cause him to be arrested or that he was dangerous or that he needed to be taken off the streets. He had not done anything physical, it was "just his mouth." (R. 55.) That was why she called for the police. She explained to the officer that T.D.F. had been mad about being left at school, and that he gets loud and fussy when his medicine is not right. She further told Officer Holloway that the situation was under control and that T.D.F. was on his way to his aunt's house. S.F. never said that T.D.F. had thrown anything. Officer Holloway told S.F. that she intended to look for T.D.F. anyway, and she asked S.F. if she wanted T.D.F. brought home. S.F. told Officer Holloway not to bring T.D.F. home because he was spending the weekend with his aunt. S.F. testified that about five months earlier T.D.F. behaved the same way, and S.F. had called for the police. That time, the police came to her house and they talked to T.D.F. and calmed him down and that was what she was expecting this time, but the situation resolved itself before the police arrived. According to S.F., she explained all that to Officer Holloway.
At the close of all the evidence, T.D.F. moved for a judgment of acquittal, arguing that the police had no probable cause to stop him. He argued that his mother had testified that, even though he had been loud, he was not dangerous, he was not a runaway, she knew where he was going, and there had been no domestic violence. He was walking down the street when the police tried to stop him and talk to him, but then they prevented him from walking away by physically detaining him without any probable cause to believe that he had done anything wrong. The State responded that T.D.F. was a 16-year-old minor on the streets shortly following a display of bad behavior that caused his mother to telephone emergency 911 for help. T.D.F. left home under these circumstances. The State argued that the police had every reason to approach T.D.F. to investigate the situation for which they had been summoned. The State argued that at the time T.D.F. was arrested, the arrest was "just and there was probable cause." (R. 60.)
The juvenile court entered a judgment for an acquittal as to the disorderly-conduct charge, but refused to enter a judgment of acquittal as to the second-degree assault and resisting-arrest charges. The juvenile court found that even if the officers had no probable cause,
"they did have reasonable suspicion, which would justify detaining [T.D.F.] until they could investigate the situation, but they never had the opportunity to investigate the situation because he became immediately combative, according to the evidence, as I interpret the evidence, *115 and was fighting and resisting the officers."
(R. 61.) The defense made no further argument regarding the sufficiency of the evidence. There was no postjudgment motion. T.D.F. appealed.
Analysis
Because this is a juvenile-court matter in which the juvenile-court judge is the trier of fact, we are mindful of the following:
"Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala. 1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala. 1994)."
Ex parte Agee, 669 So.2d 102, 104 (Ala. 1995). See R.L.L. v. State, 564 So.2d 474, 476 (Ala. Crim. App. 1990) ; C.D.U. v. State, 552 So.2d 178, 180 (Ala. Crim. App. 1989) ("When evidence is presented ore tenus, the court's decision must be given every reasonable presumption and we will not overturn its finding 'if it was supported by credible evidence unless it was palpably wrong.' Department of Human Resources v. Middleton, 519 So.2d 540 (Ala. Civ. App. 1987).").
" 'Section 12-15-65(e), Ala. Code 1975, requires that an adjudication of delinquency be supported by "proof beyond a reasonable doubt, based on competent, material[,] and relevant evidence." The credibility of witnesses and the truthfulness of testimony in delinquency proceedings is for the trier of fact to determine. C.T.L. v. State, 599 So.2d 94 (Ala. Crim. App. 1992). Furthermore, in resolving questions of sufficiency of the evidence, this court must view the evidence in the light most favorable to the state. Id.' "
R.B.H. v. State, 762 So.2d 382, 383 (Ala. Crim. App. 1999) (quoting A.A.G. v. State, 668 So.2d 122, 124 (Ala. Crim. App. 1995) ).
The general standard for assessing the sufficiency of the evidence is applicable to the review of juvenile proceedings. See J.W.B. v. State, 651 So.2d 73, 75 (Ala. Crim. App. 1994) (applying " '[t]he general standard by which we review the evidence' " to a juvenile proceeding (quoting Robinette v. State, 531 So.2d 682, 687 (Ala. Crim. App. 1987) ) ).
"In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala. Cr. App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala. Cr. App. 1980), cert. denied, 387 So.2d 283 (Ala. 1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala. Cr. App. 1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt.
*116 Willis v. State, 447 So.2d 199 (Ala. Cr. App. 1983) ; Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969) ; Willis v. State."
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala. Crim. App. 1993).
Additionally, it is well settled that "[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the [trier of fact]." Smith v. State, 698 So.2d 189, 214 (Ala. Crim. App. 1996), aff'd, 698 So.2d 219 (Ala. 1997). See Ex parte Vaughn, 495 So.2d 83 (Ala. 1986). See also C.J. v. Marion Cty. Dep't of Human Res., 5 So.3d 1259, 1271 (Ala. Civ. App. 2008) (discussing the ore tenus presumption and the role of the juvenile court judge as the " 'sole judge of the facts and of the credibility of witnesses' " (quoting Woods v. Woods, 653 So.2d 312, 314 (Ala. Civ. App. 1994) ) ).
I.
T.D.F. contends on appeal that the trial court erred when it denied his motion for a judgment of acquittal because, he says, there was insufficient evidence establishing that T.D.F.'s arrest was lawful and there was insufficient evidence of resisting arrest. In his brief, T.D.F. first asserts, as he did at trial, that the officers had no probable cause to stop him. He then argues for the first time that the juvenile court erred in denying his motion by finding that the officers had reasonable suspicion to detain T.D.F. He then asserts that there was insufficient evidence of resisting arrest because, he says, T.D.F. was not combative until the officers tried to illegally restrain him.
Initially, T.D.F.'s appellate claim that the juvenile court erred in denying his motion for a judgment of acquittal by finding that the officers had reasonable suspicion to detain T.D.F. was not presented to the trial court; thus, it is not preserved. It is well settled that "[i]n order to preserve an issue for our review, a party must first specifically raise the issue before the trial court, [and] [t]he trial court must be given the first opportunity to address the issue." Meadows v. State, 773 So.2d 1053, 1054 (Ala. Crim. App. 2000) (internal citations omitted). T.D.F. moved for a judgment of acquittal only on the ground that the police did not have probable cause, and he failed to object to the juvenile court's finding that officers had reasonable suspicion to detain him. Because T.D.F. has challenged for the first time on appeal the trial court's finding of reasonable suspicion, it is not preserved for this Court's review. "An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented." Pate v. State, 601 So.2d 210, 213 (Ala. Crim. App. 1992) ; Jordan v. State, 574 So.2d 1024, 1025 (Ala. Crim. App. 1990) (holding that claim was not preserved for appellate review where defendant did not first present his argument to the trial court). Therefore, T.D.F. is not entitled to review of his claim that the juvenile court erred in finding that the police officers acted with reasonable suspicion when they stopped T.D.F.
Furthermore, the officers did not need probable cause or reasonable suspicion to engage in a conversation with T.D.F. The officers had the right to approach T.D.F. on the street and to speak with him; this is even more so if, as the officers testified, they saw T.D.F. walking in the middle of the street.
*117 " 'The Fourth Amendment comes into play only if the police have made a "seizure." "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." I.N.S. v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).... Not every encounter between an individual and a police officer is a seizure. Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) ; United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) ; United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976).'
" Worthy v. State, 473 So.2d 634, 636 (Ala.Crim.App.1985). '[C]haracterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.' United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)."
Doucette v. State, 10 So.3d 117, 119-20 (Ala. Crim. App. 2008). Doucette also cites State v. Harris, 384 N.J.Super. 29, 45, 894 A.2d 8, 17-18 (2006) ("Brief, non-intrusive encounters with individuals on the street or in parked cars implicate none of the privacy or security concerns engendered by discretionary police spot checks of moving vehicles."), and In re the Welfare of E.D.J., 502 N.W.2d 779, 782 (Minn. 1993) ("[T]he mere act of approaching a person who is standing on a public street or sitting in a car that is parked and asking questions is not a 'seizure.' ").
" ' "[I]f an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure." ' "
Doucette v. State, 10 So.3d 117, 121 (Ala. Crim. App. 2008) (quoting Ex parte Betterton, 527 So.2d 747 (Ala. 1988), quoting in turn 3 W. LaFave, Search & Seizure § 9.2(h) (2d ed. 1987)(footnotes omitted) ); United States v. Willis, 759 F.2d 1486, 1495 (11th Cir. 1985) (holding that police-citizen encounters of a restricted investigative scope conducted in a noncoercive manner do not trigger Fourth Amendment protections).[4]
However, the United States Supreme Court has ruled that, unless the *118 police have reasonable suspicion or probable cause to stop an individual, the police may be ignored.
" ' "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.... [ Florida v. Royer, 460 U.S. 491, 498 (1983) ]. And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." ' "
W.D.H. v. State, 16 So.3d 121, 126 (Ala. Crim. App. 2008) (quoting Ex parte James, 797 So.2d 413, 417 (Ala. 2000), quoting in turn Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (emphasis added) ).
Officer Holloway testified that, when Officer Thompson arrived, T.D.F. stopped walking about 10 feet in front of Officer Thompson's car, and he "threw the suitcases down and tried to take off when [they] were trying to get him to come talk to [them]." (R. 31.) The implication from "taking off" is that T.D.F. tried to run from the officers. Therefore, as stated in W.D.H., T.D.F.'s attempt to flee provided Officer Thompson with the authority to grab T.D.F. by his shirttail to prevent his flight. Then, T.D.F.'s immediate physical resistance elevated what was intended to be nonintrusive questioning for the purpose of a welfare check into the offenses of resisting arrest and assault.
Therefore, based on the above, the juvenile court did not err in denying T.D.F.'s motion for a judgment of acquittal as to the second-degree-assault and resisting-arrest charge.
II.
T.D.F. contends that his adjudication for both resisting arrest pursuant to § 13A-10-41, Ala. Code 1975, and second-degree assault pursuant to § 13A-6-21(a)(4), Ala. Code 1975, was a violation of the Double-Jeopardy Clause. This claim was raised for the first time on appeal as a jurisdictional defect. Multiple convictions in a single proceeding for both a greater- and a lesser-included offense has been recognized as a double-jeopardy claim that implicates the trial court's jurisdiction. See Ex parte Benefield, 932 So.2d 92 (Ala. 2005).
T.D.F. was charged with violating § 13A-10-41, Ala. Code 1975, which defines resisting arrest as:
"(a) A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person."
T.D.F. was charged with second-degree assault, which is defined in § 13A-6-21(a)(4), Ala. Code 1975, as:
"(a) A person commits the crime of assault in the second degree if the person does any of the following:
"....
"(4) With intent to prevent a peace officer, as defined in Section 36-21-60 ... from performing a lawful duty, he or she intends to cause physical injury and he or she causes physical injury to any person...."
*119 The State concedes on appeal that the principles against double jeopardy have been violated because, as T.D.F. was charged, resisting arrest is a lesser-included offense to second-degree assault. The State asserts that the adjudication for second-degree assault should be affirmed, but that the case should be remanded to the juvenile court with directions to set aside the adjudication for resisting arrest.
"(a) ... An offense is an included one if:
"(1) It is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged.
"....
"(4) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interests, or a lesser kind of culpability suffices to establish its commission."
§ 13A-1-9, Ala. Code 1975.
"In Blockburger v. United States, the Supreme Court of the United States enumerated the 'same elements' test for determining whether two charges constitute the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. 284 U.S. 299 (1932). Under the Blockburger test, 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not. Id. (emphasis added). The United States Supreme Court has also held 'that a lesser included and a greater offense are the same under Blockburger....' Brown v. Ohio, 432 U.S. 161, 166 n.6 (1977). See also Perkinson v. State, 273 Ga. 491, 494, 542 S.E.2d 92, 95 (2001) ('For double jeopardy purposes, a lesser-included and a greater offense are the "same offense" under the Fifth Amendment because the lesser offense requires no proof beyond that which is required for the conviction of the greater offense.')."
Gholston v. State, 57 So.3d 178, 184 (Ala. Crim. App. 2010).
The State correctly asserts that this case is no different than Crear v. State, 591 So.2d 530 (Ala. Crim. App. 1991). In Crear, this Court found resisting arrest to be a lesser-included offense to third-degree assault as charged under § 13A-6-22(a)(4), Ala. Code 1975. Under § 13A-6-22(a)(4), a person commits third-degree assault if, "with intent to prevent a peace officer from performing a lawful duty, he causes physical injury to any person." The Crear court reasoned that both § 13A-1-9(a)(1) and (a)(4) were satisfied because "[r]esisting arrest is established, under the facts of this case, by fewer than all the facts required to establish subsection [13A-6-22](a)(4) assault, and it differs, under the facts of this case, from subsection [13A-6-22](a)(4) assault only in that it contemplates a lesser injury or risk of injury to the peace officer." 591 So.2d at 534. This Court rejected the State's argument in Crear asserting that resisting arrest and third-degree assault were two different acts. This Court stated:
"The problem with this argument is that the offenses charged in the indictments were assaults 'with intent to prevent [the officers] from performing a lawful duty,' and not other assault offenses. Compare § 13A-6-22(a)(1) ('A person commits the crime of assault in the third degree if [w]ith intent to cause physical injury to another person, he causes physical injury to any person.'). When the charged offense subsumes another crime as a lesser included offense, appellant's *120 commission of any other uncharged crime is simply immaterial to the lesser included offense analysis."
Crear v. State, 591 So.2d 530, 534 (Ala. Crim. App. 1991).
The State correctly concedes that the Crear analysis applies in T.D.F.'s case because T.D.F. was charged with second-degree assault for acting "with intent to prevent a peace officer ... from performing a lawful duty." § 13A-6-21(a)(4), Ala. Code 1975. Therefore, as in Crear, both § 13A-1-9(a)(1) and (a)(4) were satisfied because resisting arrest was established, under the facts of this case, by fewer than all the facts required to establish second-degree assault under § 13A-6-21(a)(4), and it differs, under the facts of this case, from second-degree assault under § 13A-6-21(a)(4) only in that it contemplates a lesser injury or risk of injury to the peace officer.
Therefore, T.D.F.'s adjudication as a delinquent based on resisting arrest and second-degree assault, as they are charged in his case, violate the prohibition against double jeopardy. Therefore, based on the forgoing, T.D.F.'s adjudication as a delinquent based on second-degree assault is affirmed; however, this cause is remanded to the juvenile court with directions to set aside the adjudication based on resisting arrest.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Windom, P.J., and Kellum, Burke, and Joiner, JJ., concur.

The juvenile court granted T.D.F.'s motion for judgment of acquittal as to the following charges: two counts of second-degree criminal mischief, case JU-13-378.14; disorderly conduct, JU-13-378.15; and second-degree criminal trespass, JU-13-378.18.

Neither T.D.F.'s condition nor his medication was described in the record.

Officer Holloway testified that the ear piece that she wore for work had bruised her eardrum.

" ' "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." '
"State v. Foreman, 133 N.C.App. 292, 515 S.E.2d 488 (1999), quoting State v. Farmer, 333 N.C. 172, 187, 424 S.E.2d 120, 129 (1993), quoting in turn United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). 'Mendenhall establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)."
Doucette v. State, 10 So.3d at 122. Here, this Court does not consider the presence of two officers, without more, to have been threatening. Officers often work in pairs. Moreover, this Court does not consider that it was threatening for Officer Thompson to park four car lengths away from T.D.F. in a position that blocked T.D.F.'s path. At that distance, T.D.F. was not confined and should not have perceived Officer Thompson as a threatening or compelling presence.